EUGENE K. MALANDRO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Malandro v. Commissioner
Docket No. 9813-83.
United States Tax Court
T.C. Memo 1989-135; 1989 Tax Ct. Memo LEXIS 135; 56 T.C.M. (CCH) 1577; T.C.M. (RIA) 89135; March 29, 1989. *135 Petitioner's wife embezzled more than $ 500,000 from her employer, a bank, during 1978 through 1981. Petitioner and his wife filed joint tax returns for 1978 through 1981 which omitted the embezzled income. Petitioner did not review the tax returns when he signed them. Petitioner's wife handled all the family finances. Held: (1) Respondent has failed to show by clear and convincing evidence that petitioner has an underpayment due to fraud for any of the years 1978 through 1981. Sec. 6653(b), I.R.C. 1954. (2) Petitioner is not an innocent spouse for any of the years 1978 through 1981. Sec. 6013(e), I.R.C. 1954. Ronald A. Marks, Sr., for the petitioner. Frank R. DeSantis, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6653(b)[1] (fraud) against petitioner as follows: Additions to Tax
Year
Deficiency
Section 6653(b)
1978
$ 35,854.20
$ 17,927.10
1979
98,525.33
49,262.67
1980
87,224.88
43,612.44
1981
59,902.53
29,951.27
The *136 issues for decision are as follows: (1) Whether petitioner is liable for additions to tax under section 6653(b) for fraud; and (2) Whether petitioner qualifies for innocent spouse treatment under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioner resided in Masury, Ohio. Petitioner and His Marriage
Petitioner married Jean L. Malandro (hereinafter sometimes referred to as "Malandro") in 1966; they had one child. After they were married, petitioner and Malandro lived in a rented apartment for 8 to 10 years until they were able to buy a mobile home. Petitioner at one time majored in accounting, then changed to general business administration at Youngstown University. During the period 1972 through 1977 petitioner completed a number of courses, including the following: Accounting Principles I and II; Economic Principles I, II, and III; Introduction to Business; Advertising Fundamentals; Marketing; and Personal Finance. In 1966, petitioner started employment at RMI Company as an inspection clerk. Petitioner was progressively *137 promoted by RMI Company and, in 1978, was employed as a cost analyst. Petitioner's duties as a cost analyst included, among other things, keeping track of a metal ingot's weight as it was processed. RMI's job description for a cost analyst included programming monthly cost accounting closing schedules, and preparing detailed analyses of major expense items as determined from a monthly budget and cost analysis. In 1979, petitioner was promoted to budget and cost analyst and maintained this position through 1981. Petitioner's duties as a budget and cost analyst included, among other things, determining how much money was spent in different cost centers such as payroll taxes and office supplies. Petitioner and Malandro separated about 1975 for about 6 or 7 months, and again in the winter of 1980. On March 20, 1981, petitioner and Malandro filed a petition for dissolution of marriage and executed a separation agreement. Petitioner and Malandro subsequently reconciled in 1981. A second petition for dissolution of marriage was filed on March 15, 1982, and the marriage was dissolved on March 23, 1982. Malandro's Embezzlements
During 1978 through 1981, Malandro was employed as a branch *138 manager at the Vienna Branch of the Cortland Savings and Banking Company. During 1978 through 1981, Malandro embezzled funds of the Cortland Savings and Banking Company (hereinafter sometimes referred to as "the Cortland Bank") by creating loans to fictitious borrowers. Malandro embezzled the following amounts in the years listed in table 1: Table 1
1978
$  71,880.00
1979
170,582.58
1980
152,051.75
1981
109,419.09
Total embezzled
$ 503,933.42
In November 1981, Malandro presented the Board of Directors of the Cortland Bank with a letter confessing her embezzlements. This letter stated, in part, as follows: Gentlemen: For the past eight years, I have been making loans in false names using false collateral to back them up. The total of these loans is now $ 583,877.51. The loan cards for all these loans are attached. Some of the names are actually real people, with their correct addresses; however, all the loans and collateral are false. I have made up the collateral and have signed all the loan papers. The checks in some cases were made out to the person's name on the loan and in some cases to other people. In most cases, I cashed the checks. There never was and is not at the present any *139 employee, officer or director of the Cortland Bank, in any way involved with this falsehood at present or in the past. There is no officer, director of employee of the Cortland Bank, to my knowledge, who has any knowledge or any suspicion I have been doing this. There is no one, including my family, friends, acquaintances or customers of the bank, who is aware, in any way or any part, that I have been doing this. * * * Of course, I cannot say I did not use any of the money for my family or myself. I just felt it was my responsibility to take care of my family and give them what they needed and wanted. I felt so totally that my way of showing my love to my husband was to give and keep on giving him to make sure he had whatever he needed and wanted. It is impossible for me to tell how much was used by me for my family. However, Gene does make close to $ 40,000.00 per year at present and none of the money is put away or saved or hidden. No member of my family knows anything about what I have done, no one was involved, nor did anyone ask where the money came from, not even Gene. As long as I gave and provided, no one questioned. I felt it was my duty and responsibility. * * * Any *140 large purchases Gene and I made was [sic] done on an installment basis and with monthly payments from our salaries; you have only to check this fact. There are some accounts in the bank with my name on them that belong to my mother and father and uncle. There are two certificates of deposit and some savings in my son, Marc's name and my mothers, which is totally his money and has nothing whatsoever to do with what I have done. Malandro showed this letter to petitioner before it was presented to the Board of Directors of the Cortland Bank. At this time, in November 1981, petitioner first learned that Malandro was embezzling from the Cortland Bank. Malandro pleaded guilty on April 7, 1983, to a one-count information filed on March 29, 1983, charging her with willfully and knowingly embezzling and misapplying the sum of $ 632,915.58 of the money and funds of the Cortland Bank. [2] On June 2, 1983, Malandro was sentenced to 3 years in Federal prison based on her guilty plea. Tax Returns
Petitioner and Malandro filed joint tax returns *141 for 1978 through 1981. The joint tax returns showed adjusted gross income of $ 35,639.92 for 1978; $ 42,470.83 for 1979; $ 50,639.33 for 1980; and $ 59,717.27 for 1981. The money that Malandro embezzled was not reported on any of the joint tax returns for 1978 through 1981. [3] Petitioner signed the 1978 tax return on January 30, 1979, the 1979 tax return on February 3, 1980, and the 1980 tax return on January 31, 1981. The 1981 tax return was filed on March 15, 1982. The embezzled income attributable to Malandro (as set forth in table 1, supra) and omitted from the joint tax returns for 1978, 1979, 1980, and 1981, exceeded 25 percent of the amount of gross income stated on those returns for each of the respective years. For 1977 through 1981, petitioner and Malandro reported on their joint tax returns the income items shown in table 2. Table 2
Item
1977
1978
1979
1980
1981
Malandro's salary
$ 13,650 $ 15,450
$ 17,220 $ 18,276 $ 16,443
Petitioner's salary
18,102 19,663
23,502 32,037 37,101
Interest
13 101
2,177 3,548 3,347
Dividends
124 43
280 138 92
Capital gain (loss)
(456)
425
(497)
--  6,644
Rental income (loss)
--  -- --  (3,222)
249
Adjusted gross income
31,333 35,640
42,471 50,639 59,717
*142 For 1977 through 1981, petitioner and Malandro reported on their joint tax returns the itemized deductions and tax liabilities (Social Security taxes paid are reported on their respective W-2 forms attached to their joint actions) shown in table 3. Table 3
Item
1977
1978
1979
1980
1981
State and local taxes
$ 1,693
$ 1,487
$ 3,471
$ 2,800
$ 3,058
Interest
6,184
8,316
12,038
13,666
17,223
Contributions
3,926
3,468
4,302
7,082
5,176
U.S. Income tax
3,437
4,240
4,078
5,425
7,868
Social Security taxes
1,764
2,005
2,459
2,708
3,069
Checking Accounts
During 1978 through 1981, petitioner and Malandro had several checking accounts, including two joint accounts with the Cortland Bank; an account under Malandro's name with the Cortland Bank; an account under Malandro's name with the McDowell National Bank (hereinafter sometimes referred to as "the McDowell Bank"); and an account under petitioner's name with BancOhio National Bank (hereinafter sometimes referred to as "BancOhio"). During 1978 through 1981, petitioner wrote checks against the two Cortland Bank joint accounts and the BancOhio account; an estimate of the total number of checks for each year and an estimate of the total amount of checks for each year are listed in table *143 4. Table 4
Number of Checks
Amount of Checks
1978
49
$  2,100
1979
58
5,300
1980
80
5,800
1981
76
11,800
Totals
263
$ 25,000
During 1978 through 1981, Malandro wrote checks against the joint accounts with the Cortland Bank, the separate account with the Cortland Bank, and the separate account with the McDowell Bank; an estimate of the total number of checks for each year and an estimate of the total amount of checks for each year are listed in table 5. Table 5
Number of Checks
Amount of Checks
1978
797
$ 156,800
1979
888
235,400
1980
375
186,600
1981
802
117,700
Totals
2,862
$ 696,500
Real Estate Purchases
On June 19, 1978, petitioner and Malandro bought a residence located at 187 Lynita, Brookfield, Ohio (hereinafter sometimes referred to as "Lynita"), for $ 65,000. The purchase of Lynita was financed through a blanket mortgage with McKinley Federal Savings and Loan Association (hereinafter sometimes referred to as "the McKinley S & L") in the amount of $ 92,000, secured by Lynita and secured by another property which petitioner and Malandro owned at 125 Wintergreen Drive, Brookfield, Ohio (hereinafter sometimes referred to as "Wintergreen"). After petitioner and Malandro bought Lynita, they sold Wintergreen on *144 a land contract which paid about $ 335 a month; the monthly payments were sent to the McKinley S & L. The McKinley S & L applied the $ 335 against the blanket mortgage which required monthly payments of $ 772.08. In February 1980, petitioner and Malandro added a family room with a fireplace to Lynita and in addition, had remodeling work performed in the T.V. room and kitchen. The total cost of these improvements was $ 10,000, paid with a cashier's check drawn on the Cortland Bank and signed by Malandro. On February 1, 1980, petitioner and Malandro bought a condominium located at 209 Tomaka Trail (hereinafter sometimes referred to as "Tomaka"), in Seminole County, Florida, for $ 65,000. Petitioner and Malandro assumed an existing mortgage in the original principal amount of $ 49,850 and paid the remainder in cash. The source of the cash was an $ 18,750 second mortgage placed on Lynita on January 24, 1980. On March 11, 1981, petitioner entered into an agreement to buy for $ 52,000 a property located at 399 Golf Drive in Brookfield, Ohio (hereinafter sometimes referred to as "Golf Drive"). Petitioner and Malandro had separated and were about to file for divorce. Golf Drive was *145 to be petitioner's home. When they divorced in March 1982, Golf Drive was petitioner's home. In connection with this purchase, petitioner was obligated to make a down payment and pay closing costs, the combined total of which was $ 17,617.40. On March 24, 1981, petitioner entered into a $ 35,000 mortgage agreement with the Cortland Bank for the balance of the purchase price on Golf Drive. Both the $ 17,617.40 and the $ 35,000 came from the Cortland Bank; however, the mortgage deed shows a debt of only $ 35,000. On July 1, 1981, petitioner and Malandro sold Tomaka. Proceeds of the sale, net of selling costs, were $ 74,643.50. On their 1981 tax return, petitioner and Malandro reported a $ 6,643.50 gain from this sale. Auto and Snowmobile Purchases
On November 28, 1978, petitioner bought a 1979 Chevrolet Monte Carlo for $ 8,977.34, plus $ 359.10 Ohio sales tax. [4] Some part of this purchase was financed by the Cortland Bank. The Cortland Bank's lien was discharged on September 11, 1979. On September 17, 1979, the McDowell Bank noted a lien on this car; this lien was discharged on August 15, 1980. On February 17, 1981, the Cortland Bank again noted a lien on this car; this lien *146 was discharged on April 25, 1981. On September 17, 1979, petitioner bought a 1979 Chevrolet Corvette for $ 11,000, plus $ 400 Ohio sales tax. The $ 11,000 purchase price was paid in full on September 7, 1979, by two cashier's checks drawn on the Cortland Bank and signed by Malandro. On September 11, 1979, petitioner and Malandro borrowed $ 10,000 from the McDowell Bank. This obligation was secured by petitioner's 1979 Chevrolet Corvette and 1979 Chevrolet Monte Carlo. Payment on the obligation was $ 282.45 per month. The McDowell Bank's lien was discharged on July 14, 1982, at the request of petitioner's credit union, RMI Co., Employee Credit Union, Inc. (hereinafter sometimes referred to as "the RMI Credit Union"), which paid the $ 3,919.06 balance then remaining. In October 1980, Malandro bought a 1981 Chevrolet Camaro and borrowed $ 8,000 from the RMI Credit Union to pay for it. Payments on this obligation were $ 210.67 per month. Although this *147 was Malandro's car, the payments were to be made out of petitioner's salary checks. On August 13, 1981, Malandro bought a 1981 Buick Riviera in petitioner's name, for $ 14,878 plus $ 358.32 Ohio sales tax. They received $ 5,920 trade-in allowance on the 1979 Chevrolet Monte Carlo used toward the purchase price of the Buick Riviera. The balance of the purchase price was financed through a loan to Malandro from RMI Credit Union, in which petitioner and Malandro had separate accounts. Petitioner bought three new snowmobiles and two new motorcycles during 1978 through 1981. On February 2, 1978, petitioner bought a 1978 Polaris snowmobile for $ 1,397 which was financed in part through the RMI Credit Union. On November 13, 1978, petitioner bought a 1979 Polaris snowmobile for $ 2,530.56. Although petitioner made a $ 216 down payment, he borrowed the full purchase price the next day under his account at the RMI Credit Union. On August 30, 1979, petitioner bought a 1980 Skidoo snowmobile for $ 1,694.16, making a $ 100 downpayment and financing the balance. On January 3, 1981, petitioner bought a 1981 Yamaha motorcycle for $ 2,069.12, which was financed in full through RMI Credit Union. *148 On April 13, 1981, petitioner bought a 1981 Yamaha motorcycle for $ 1,069 which petitioner did not finance but paid for in full. Petitioner also made other snowmobile/motorcycle/bicycle-related purchases, which for 1978 totaled $ 497, for 1979 totaled $ 944.41, for 1980 totaled $ 898.81, and for 1981 totaled $ 137.96. Vacations
During 1978, petitioner and his family flew to Florida for a 1-week vacation; petitioner and Malandro flew to Hawaii for a 10-day vacation; and petitioner and his family drove to Florida for a 1-week vacation. During 1979, petitioner and his family flew to Florida and New Orleans for a 2-week vacation; petitioner and Malandro flew to Tampa, Florida, for a football game; petitioner and Malandro flew to Las Vegas, Nevada, for a 3-day vacation; and petitioner drove to Florida and flew back. During 1980, petitioner and his family flew to Hawaii for an 8-day vacation; petitioner and Malandro flew to Las Vegas for a 4-day vacation; and petitioner and his family flew to Orlando, Florida, for a 1-week vacation. During 1981, petitioner and his family flew to Las Vegas for a 4-day vacation. Other Expenditures
During 1979, 1980, and 1981, petitioner and Malandro spent *149 $ 2,848.14, $ 1,094.66, and $ 3,024.18, respectively, for landscaping work performed on Lynita. [5] *150 Malandro wrote the checks to pay the landscaping bills. During 1978, 1979, 1980, and 1981, Malandro made payments by check to department stores in amounts totalling about $ 5,524, $ 8,320, $ 6,998, and $ 7,916, respectively. During 1978, 1979, 1980, and 1981, Malandro made payments by checks to furniture stores to buy furniture in amounts totalling about $ 17,577, $ 4,046, $ 9,557, and $ 823, respectively. During 1978, 1979, 1980, and 1981, Malandro wrote checks for insurance to several insurance companies in amounts totalling about $ 1,345, $ 1,571, $ 1,890, and $ 785, respectively. In 1981 petitioner wrote a check to an insurance company in the amount of $ 533.50. During 1978, 1979, 1980, and 1981, Malandro wrote checks to family members in amounts totalling about $ 395, $ 21,600, $ 1,600, and $ 1,545, respectively. Of the checks written in 1979, $ 17,500 were payable to petitioner's brother. During 1978, 1979, 1980, and 1981, Malandro wrote checks to pay for utility expenses in amounts totalling about $ 1,700, $700, $ 600, and $ 800, respectively. During 1978, 1979, 1980, and 1981, Malandro wrote checks payable to "cash" in amounts totalling about $ 18,300, $ 24,500, *151 $ 18,700, and $ 9,000, respectively; petitioner wrote checks payable to "cash" in amounts totalling about $ 750, $ 1,950, $ 2,300, and $ 1,900. During 1978, 1979, 1980, and 1981, Malandro bought shoes for amounts totalling about $ 700, $ 1,130, $ 370, and $ 24, respectively. During 1978, 1979, 1980, and 1981, Malandro bought jewelry for amounts totalling about $ 1,050, $ 6,325, $ 1,100, and $ 1,060, respectively. During 1978, 1979, 1980, and 1981, Malandro wrote checks to pay principal and interest obligations on several loans (excluding any repayments to RMI Credit Union), the checks being in amounts of about $ 11,391, $ 13,644, $ 23,289, and $ 12,531, respectively. The payments on loan obligations taken out through RMI Credit Union were made either by payroll deductions from petitioner's paycheck or by checks written by Malandro. Payments of interest and principal on the RMI Credit Union loans, made during 1978, 1979, 1980, and 1981, totalled about $ 2,778, $ 5,689, $ 9,853, and $ 5,936, respectively. During 1978, 1979, 1980, and 1981, Malandro wrote checks to pay off credit card liabilities in amounts totalling about $ 21,487, $ 23,460, $ 27,715, and $ 18,835, respectively. During *152 1978, 1979, 1980, and 1981, Malandro wrote checks to pay for vacation and entertainment expenses in amounts totalling about $ 919, $ 3,207, $ 13,281, and $ 8,508, respectively. During 1978 and 1979, Malandro made investment purchases with various brokerage houses in amounts totalling $ 6,703 and $ 8,090, respectively. In 1978 and 1979, Malandro sold stocks generating proceeds, net of selling costs, in the amount of $ 3,525 and $ 4,190.53, respectively. During 1978, 1979, 1980, and 1981, petitioner and Malandro incurred automobile expenses in amounts totalling about $ 2,426, $ 1,688, $ 2,688, and $ 1,212, respectively; these expenses were paid by either petitioner or Malandro. During 1978, 1979, 1980, and 1981, Malandro and petitioner wrote checks for miscellaneous expenditures in amounts totalling about $ 11,859, $ 11,042, $ 18,339, and $ 14,548, respectively. A summary of the amount of checks written to pay the aforementioned expenditures and payments on loan obligations for 1978, 1979, 1980, and 1981 appears in table 6: Table 6
Expenditure Item
1978
1979
1980
1981
Lynita home improvement
$ 10,000
Florida condominium downpayment
15,000
Golf Dr. downpayment & closing costs
$ 17,617
1979 Chevrolet Corvette (net of loan
from the McDowell Bank)
$   1,000
snowmobiles/motorcycles
$     713
944
899
1,206
landscaping
2,848
1,095
3,024
department stores
5,524
8,320
6,998
7,916
furniture
17,577
4,046
9,557
823
insurance
1,345
1,571
1,890
1,318
checks to family members
395
21,600
1,600
1,545
utility expenses
1,700
700
600
800
checks to cash by Malandro
18,300
24,500
18,700
9,000
checks to cash by petitioner
750
1,950
2,300
1,900
shoes
700
1,130
370
24
jewelry
1,050
6,325
1,100
1,060
loan int. and principal payments
14,169
19,332
33,142
18,467
credit card liabilities
21,487
23,460
27,715
18,835
vacation & entertainment expenses
919
3,207
13,281
8,508
investment purchases
6,703
8,690
automobile expenses
2,426
1,688
2,688
1,212
contributions
3,467
4,301
7,081
5,175
Federal income tax liabilities
4,240
4,078
5,425
7,868
miscellaneous expenses
11,859
11,042
18,339
14,548
Total Expenditures *
$ 113,300
$ 150,700
$ 177,800
$ 120,800
*153 Malandro managed all the checking accounts and paid all the household bills of the family, such as gas bills, water bills, mortgage payments, and food bills. Until March 20, 1981, Malandro signed and deposited petitioner's paychecks. Malandro prepared the 1978 through 1981 joint tax returns. Petitioner signed the 1978 through 1981 tax returns without reviewing the supporting schedules and questioned Malandro only about the amount of the tax refund they could expect for a given year. OPINION Respondent maintains that the deficiencies for 1978, 1979, 1980, and 1981 were due to fraud on petitioner's part and so petitioner is liable for the fraud addition to tax under section 6653(b). Petitioner contends that respondent did not meet respondent's burden of proof on the fraud issue. With regard to 1981, petitioner asserts that when he signed the 1981 tax return, he did not understand the consequences of what he was doing, did not know the effect of signing his return, and did not evade a tax believed to be owing. Petitioner also claims that he did *154 not know nor did he have reason to know of the embezzled income and its omission from the tax returns, and that he did not significantly benefit from the embezzled income. Consequently, petitioner contends, he is entitled to relief from the deficiencies for 1978 through 1981 under the innocent spouse provisions of section 6013(e). Respondent contends that petitioner does not qualify for relief under the innocent spouse provisions of section 6013(e) because (1) petitioner was aware or had reason to know of the embezzlement income, and (2) since petitioner received substantial benefits from the embezzlement income, it would not be inequitable to hold him liable for the deficiencies. We agree with petitioner as to fraud; we agree with respondent's first contention as to innocent spouse. I. Fraud
When respondent seeks to impose the addition to tax under section 6653(b), [6] *155 he bears the burden of proving by clear and convincing evidence that petitioner has an underpayment, and that some part of this underpayment is due to fraud. Sec. 7454(a); [7]Rule 142(b); [8] e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The issue of fraud poses a factual question which is to *156 be decided on an examination of all the evidence in the record. Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972), affg. a Memorandum Opinion of this Court; [9]Mensik v. Commissioner,328 F.2d 147 (CA7 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner,56 T.C. at 224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court; [10]Powell v. Granquist,252 F.2d 56, 60 (CA9 1958); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence ( Powell v. Granquist,252 F.2d at 61; Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (CA8 1978); Beaver v. Commissioner,55 T.C. 85, 92-93 (1970)), including the implausibility of the taxpayer's explanations. Boyett v. Commissioner,204 F.2d 205, 208 (CA5 1953), affg. a Memorandum Opinion of this Court dated Mar. *157 14, 1951. Respondent need not prove the precise amount of the underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States,466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner,465 F.2d at 303; Kreps v. Commissioner,351 F.2d 1, 6 (CA2 1965), affg. 42 T.C. 660 (1964). Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Drieborg v. Commissioner,225 F.2d 216, 219-220 (CA6 1955), affg. in part and revg. in part an unreported Memorandum Opinion of this Court dated Feb. 24, 1954; Estate of Stein v. Commissioner,25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner,250 F.2d 798 (CA2 1958). A mere understatement of income does not establish fraud. However, a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. Estate of Mazzoni v. Commissioner,451 F.2d 197, 202 (CA3 1971), affg. a Memorandum Opinion of this Court; [11]Otsuki v. Commissioner,53 T.C. at 106. Fraud is not imputed from one spouse to another; in the case of *158 a joint tax return, respondent must prove fraud as to each spouse charged with liability for the addition to tax. Section 6653(b) (last sentence) (which now appears as sec. 6653(b)(3)); Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (CA1 1972); Stone v. Commissioner,56 T.C. at 227-228. A good case could be made to prove fraud by Malandro. However, she is not before the Court and her fraudulent conduct is not transferable to petitioner. We have found that petitioner was not aware of the embezzlement until Malandro told him in November 1981. Petitioner had minimal involvement in the family finances. Malandro handled all of the family finances; she managed all the checking accounts, paid all the household bills and signed and deposited all of petitioner's paychecks. Malandro wrote substantially more checks in number (11 times as many) and amount (28 times as much) than petitioner. (See tables 4 and 5, supra.) Malandro prepared the 1978 through 1981 tax returns, which petitioner signed without reviewing. Petitioner could have reviewed the tax returns, and if he had done so then he might have discovered that something was amiss; however, he did not. There *159 is no evidence that Malandro ever told him she was embezzling money from the Cortland Bank, nor is there any evidence that anyone else told him about it, before November 1981. In short, the record is void of any evidence that petitioner knew of the embezzlement before November 1981, which was after petitioner signed the 1978, 1979, and 1980 tax returns. Our holding (infra) that petitioner should have known of the omitted income does not determine that petitioner actually knew of the omission. Without actual knowledge of the omission, respondent cannot show any deceit on petitioner's behalf and cannot prove fraudulent intent. As to 1978, 1979, and 1980, respondent has not proven by clear and convincing evidence that petitioner intended to evade tax known to be due and owing. Indeed, as to those years, respondent has even failed the lesser standard of proof by a preponderance of the evidence. The matter is not so clear as to 1981. In November 1981, petitioner for the first time had actual knowledge of Malandro's embezzlement activities. Knowing of Malandro's embezzlement activity, petitioner filed the 1981 joint tax return with Malandro, and this joint tax return omitted $ 109,419.09 *160 of income embezzled in 1981. Although petitioner's knowledge of Malandro's embezzlement activities is troubling, we do not believe that this fact alone in light of the entire record establishes by clear and convincing evidence that petitioner intended to omit the embezzlement income to evade a tax he knew to be owed on such income. Malandro's actions, not petitioner's actions, evidenced an intent to conceal her 8 years of embezzlement activities from her husband, the Cortland Bank, and the Federal Government. Malandro had control over the family purse strings. Petitioner ignorantly chose not to intercede when he should have. However, petitioner's actions in signing the 1981 tax return with knowledge of the embezzlement do not appear to have been made by a person intent on defrauding the Government. At the time he signed the 1981 joint tax return, he was having marital difficulties with Malandro. Yet, he continued to let Malandro prepare the joint tax return for 1981 and he signed the return without reviewing it. If petitioner really intended to avoid any liability for the taxes associated with Malandro's embezzlement income, then he could have easily filed a separate tax return *161 instead of a joint tax return. Sec. 6012(a). It is not enough that respondent makes us suspicious of the taxpayer or even proves fraud by a preponderance of the evidence. See Kreps v. Commissioner,351 F.2d at 7; Shaw v. Commissioner,27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (CA6 1958); Gano v. Commissioner,19 B.T.A. 518, 532-533 (1930). "The conscious purpose to defraud proscribed by the statute does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik,236 F.2d 844, 846 (CA3 1956). The evidence must be clear and convincing. In the instant case, the evidence falls short of being clear and convincing. We hold for petitioner on this issue for each of the years. II. Innocent Spouse
Under section 6013(d)(3), if a husband and wife file a joint tax return for a year, then "the tax shall be computed on the aggregate income and the liability for the tax shall be joint and several." Under section 6013(e), if certain requirements are met for a year, then a spouse may be relieved of a portion of this joint tax return liability for the year. In order to qualify for innocent spouse relief, petitioner must show *162 the following: (1) that on the joint return for the year in issue, there is a substantial understatement of tax attributable to omissions from the gross income of Malandro; (2) that in signing the return, he did not know of the substantial understatement; (3) that he had no reason to know of the substantial understatement; and (4) that taking into account all the facts and circumstances, it is inequitable to hold the taxpayer liable for the deficiency attributable to the substantial understatement. Sec. 6013(e)(1). [12] *163 Petitioner bears the burden of proving that he has satisfied each statutory requirement of section 6013(e). Purcell v. Commissioner,826 F.2d 470, 473 (CA6 1987), affg. 86 T.C. 228 (1986); Sonnenborn v. Commissioner,57 T.C. 373, 381-383 (1971); Rule 142(a). The parties agree that the conditions of subparagraphs (A) and (B) of section 6013(e)(1) have been met in the instant case. We turn to the first requirement in dispute, section 6013(e)(1)(C), which requires petitioner to establish "that in signing the return he * * * did not know, and had no reason to know, that *164 there was such substantial understatement". We have found that petitioner had no actual knowledge of the substantial understatement for 1978, 1979, and 1980 when he signed the tax returns for these years. Petitioner testified that he did not know of Malandro's embezzlement activities for 1978, 1979, and 1980 when he signed the tax returns for these years. We observed petitioner's demeanor and conclude that this part of his testimony is credible and consistent with the other evidence. Malandro had virtual control of the family's finances during 1978 through 1981. Malandro managed all the checking accounts and paid all the household bills. Petitioner signed over his paychecks to Malandro from 1978 through March 20, 1981. Malandro also wrote substantially all the checks and prepared the tax returns which petitioner signed without reviewing. Petitioner also testified that he believed they were able to buy their homes, automobiles, and snowmobiles by borrowing heavily from RMI Credit Union and taking out mortgages. We conclude that petitioner did not know of the substantial understatements for 1978, 1979, and 1980. However, petitioner did know of Malandro's embezzlement activity *165 when he signed the tax return for 1981. Malandro showed petitioner a letter in November 1981 in which she detailed her embezzlement scheme. Petitioner knew at that time that Malandro was embezzling from the Cortland Bank. In spite of this knowledge, petitioner signed the joint tax return for 1981. Once petitioner knew of the embezzlement activity, whether or not he knew that embezzlement income was reportable on the 1981 return is irrelevant under section 6013(e). Quinn v. Commissioner,524 F.2d 617, 626 (CA7 1975), affg. 62 T.C. 223 (1974); McCoy v. Commissioner,57 T.C. 732, 734 (1972). Thus, for 1981, we conclude that petitioner fails to qualify for innocent spouse relief under section 6013(e). The next inquiry under section 6013(e)(1)(C) involves determining whether petitioner had reason to know of the omission of income. The test to determine whether petitioner had reason to know of the substantial understatements for 1978, 1979, and 1980 is whether a reasonable person in petitioner's circumstances could have been expected to know of the substantial understatements at the time of signing the returns. Shea v. Commissioner,780 F.2d 561, 566 (CA6 1986), affg. on this issue *166 and revg. on another issue a Memorandum Opinion of this Court; [13]Sanders v. United States,509 F.2d 162, 166-167 (CA5 1975); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 698-699 (1972). Moreover, a spouse cannot close his or her eyes to facts which might give reason to know of the unreported income. See Mysse v. Commissioner,57 T.C. at 699. Two often-considered factors from which a reasonably prudent person would be expected to infer that income was omitted from the returns are (1) unusual or lavish expenditures by the family and (2) participation in the family's business affairs. Sanders v. United States, supra at 167; Sonnenborn v. Commissioner,57 T.C. at 381-382. Petitioner is an intelligent, educated person. He had taken and successfully completed business and accounting courses at Youngstown University. He was also steadily promoted by the RMI Company. However, he was totally oblivious to the status of his household finances. Even so, he should have known that the family lived a lifestyle in excess of their means from 1978 through 1981. A reasonably prudent person would notice that the family's expenditures *167 exceeded their legitimate reported income for 1978 through 1981. This is true even taking into consideration the numerous loans petitioner and his wife made. Petitioner had information from which a person of ordinary intelligence could infer that substantial understatements existed. For 1978, petitioner and Malandro reported adjusted gross income of $ 35,639.92; the family's 1978 expenditures were about $ 113,300 (see table 6, supra), more than three times their reported adjusted gross income. The evidence for 1979 and 1980 is even more overwhelming than for 1978. For 1979, petitioner and Malandro reported adjusted gross income of $ 42,470.73; the family's 1979 expenditures were about $ 150,700 (see table 6, supra), more than 3-1/2 times their reported gross income. For 1980, petitioner and Malandro reported adjusted gross income of $ 50,634.33; the family's 1980 expenditures were about $ 177,800 (see table 6, supra), more than 3-1/2 times their 1980 reported gross income. In making these comparisons, we have given heed to petitioner's protestations that he understood that large purchases were financed by borrowing. The expenditure totals represent cash outlays, and do not include *168 expenditures of money borrowed to make the purchases. Also, we note that proceeds of sales of stock would be available, in addition to reported income, to finance expenditures. However, those proceeds amounted to only $ 3,525 [14] in 1978 and only $ 4,190.53 in 1979, not enough to explain the $ 77,000 and $ 108,000 excesses of spending over earnings for 1978 and 1979. Petitioner and Malandro bought realty, bought vehicles, went on vacations, bought furniture, and made numerous other expenditures that petitioner should have been aware of. Their loans required them to make monthly payments. The interest deductions claimed on the tax returns that petitioner signed exceeded 25 percent of the adjusted gross income reported on those tax returns, and continued to grow. We conclude that petitioner knew of the omitted *169 income for 1981 and had reason to know of the omitted income for 1978, 1979, and 1980. Petitioner claims that his case is very similar to Mysse v. Commissioner, supra.In Mysse, we held that the wife of a bank employee who embezzled more than $ 100,000 satisfied the elements of section 6013(e) and was relieved of the tax liability associated with the embezzled funds. In reaching this holding, we noted that: (1) the innocent spouse was without business knowledge and was not involved in the family finances; (2) the family's standard of living was not noticeably higher than the income reported on the tax return; and (3) there were no lavish expenditures which would have alerted the innocent spouse of unreported income. Mysse v. Commissioner, 57 T.C. at 684-691, 696-699. In the instant case, the facts are remarkably different. Petitioner is a well-educated person with business knowledge. Petitioner and his family's standard of living greatly exceeded their gross income for 1978 through 1981. During 1978 through 1981, substantial expenditures were made on such things as various homes, new cars, new snowmobiles, new motorcycles, furniture, home improvements, charitable contributions, *170 jewelry, and expensive vacations. Petitioner has not shown that he maintained such a lifestyle before 1978. Rather, the only evidence in the record regarding petitioner's lifestyle shows that after their marriage, petitioner and Malandro lived 8 to 10 years in a rented apartment until they were able to buy a mobile home. In Mysse, we stated "To be entitled to the benefits of section 6013(e) a spouse is not required to have perfect knowledge of the family's finances; nor is she required to see that the family maintains a balanced budget; however, she cannot close her eyes to unusual or lavish expenditures." Mysse v. Commissioner,57 T.C. at 699. Many tell-tale signs existed which would have alerted a reasonable person of petitioner's intelligence that something was amiss. Petitioner closed his eyes to the reality of the situation and chose not to inquire as to the means of his comparatively luxurious lifestyle. [15] We hold for respondent on this issue for each of the years. [16] *171 * * * During the trial, petitioner offered into evidence the results of a "lie-detector" examination concerning petitioner's knowledge of Malandro's embezzlement activities. Section 7453 provides that proceedings before this Court shall be conducted "in accordance with the rules of evidence applicable in trials without a jury in the United States District Court of the District of Columbia." The leading case in this area is Frye v. United States,293 Fed. 1013 (CADC 1923). In Frye, the Court of Appeals stated that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field to which it belongs." 293 Fed. at 1014. We are convinced that there is a widespread use of polygraph tests. However, in the instant case, petitioner did not present any evidence showing reliability, or the degree of reliability, either in general or under the circumstances which petitioner was tested. Also, petitioner failed *172 to present any evidence as to whether and to what extent the scientific community or any relevant portion thereof accepts the reliability of "lie-detector" or polygraph examinations. In Kropinski v. World Plan Executive Council -- U.S.,853 F.2d 948, 956 (CADC 1988), the Court of Appeals noted the suggestion that "Frye's 'general acceptance' requirement should be limited to criminal cases and a less demanding one, such as 'substantial acceptability,' applied in civil cases such as this." However, in the instant case (as in Kropinski), petitioner failed to present any evidence that the reliability of polygraph examinations has a significant following, or substantial acceptability, in the scientific community, let alone general acceptance. See also Pacella v. Commissioner,78 T.C. 604, 613-617 (1982). At the trial, we ruled that the results of the polygraph examination were not admissible, relying primarily on Frye. Our conclusion is not changed by the Court of Appeals' opinion in Kropinski, and we adhere to our earlier determination. Decision will be entered for respondent as to the deficiencies and for petitioner as to the additions to tax.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954, as in effect for the years in issue.↩
2. The $ 632,915.58 apparently represents the amount embezzled over an 8-year period including the years in issue, 1978 through 1981. See table 1, supra.↩
3. Respondent concedes that there were no other omissions from reported income for any of the years in issue. Also, respondent has not disallowed any of the claimed deductions or made any other adjustment that increased petitioner's taxable income or income tax liability.↩
4. On their 1978 tax return, petitioner and Malandro claimed a $ 247 general sales tax deduction from the sales tax tables. Apparently, they did not claim a deduction for the $ 359.10 Ohio sales tax on the 1979 Chevrolet Monte Carlo.↩
5. Petitioners' landscaping bills show work through June 1981 at 187 Lynita, the house they bought on June 19, 1978. Thereafter, it appears that the work was done at 916 Lynita, even though the parties have not presented evidence to show a sale of 187 Lynita, or a purchase or rental of 916 Lynita during any of the years in issue. To add to the puzzle, petitioner's and Malandro's March 20, 1981, petition for dissolution of marriage and separation agreement show both of them at 916 Lynita (even though other evidence shows, and we have found, that petitioner and Malandro were separated at that time), 3 months before the change in residence regarding the landscaping work. Also, petitioner's January 23, 1981, paycheck (2 months before the dissolution petition) shows his address as 916 Lynita. A change in residence might be expected to be accompanied by expenditures (such as moving, new furniture, and new furnishings), but respondent does not draw out attention to any such expenditures as further evidence of petitioner's knowledge of expenditures. This is one of the dangling threads of the instant case.
*. The totals are rounded to the nearest hundred, to take into account the fact that a number of the items in each column are approximations.↩
6. Section 6653(b) provides, in relevant part, as follows: SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. [The subsequent amendments of this provision (by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 616) and by sec. 1503(a) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742)) do not apply to the instant case.] ↩
7. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect to such issue shall be upon the Secretary. ↩
8. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
9. T.C. Memo. 1970-274↩.
10. T.C. Memo. 1966-81↩.
11. T.C. Memo. 1970-144↩.
12. SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. * * * (e) Spouse Relieved of Liability in Certain Cases. -- (1) In general. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. [Sec. 424(a) of the Tax Reform Act of 1984 (division A of the Deficit Reduction Act of 1984), Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801-802, amended sec. 6013(e) retroactively to all open years to which the Internal Revenue Code of 1954 applies. Sec. 6013(e)(1)(C) is essentially similar to the prior law's sec. 6013(e)(1)(B)↩.]
13. T.C. Memo. 1984-310↩.
14. On their 1978 tax return, petitioner and Malandro reported a $ 425 gain on the sale of 200 shares of Comair stock. The tax return shows a net sale price of $ 3,525 and an adjusted basis of zero. We do not know if the net sales price, adjusted basis, or both are in error. Respondent has not made any adjustment to, nor has he otherwise contested, the reported stock transactions.↩
15. "They have mouths, but they speak not; Eyes have they, but they see not; They have ears, but they hear not". Psalms 115:5-6.↩
16. Since petitioner failed to satisfy sec. 6013(e)(1)(C), we need not address whether petitioner met his burden of proof on the "inequitable" element under sec. 6013(e)(1)(D)↩.