**Emilia R. PIETROMONACO,**
**Petitioner–Appellant,**

v.

**COMMISSIONER INTERNAL REVENUE SERVICE,**
**Respondent–Appellee.**

**No. 92–70101.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1993.

Decided Sept. 2, 1993.

---

Bruce I. Hochman and Dennis L. Perez, Hochman, Salkin & Deroy, Beverly Hills, CA, for petitioner-appellant.

Reginia S. Moriarty and Gary R. Allen, U.S. Dept. of Justice, Tax Div., Washington, DC, for respondent-appellee.

Before: NOONAN, FERNANDEZ, and KLEINFELD, Circuit Judges.

FERNANDEZ, Circuit Judge:

Emilia Pietromonaco ("Emilia") appeals from the Tax Court's decision that she was ineligible for relief from tax liability under the "innocent spouse" provision, 26 U.S.C. § 6013(e) (1990).[1] Emilia contends that she was "innocent" within the meaning of the provision and that she should have been shielded from liability arising out of a tax deficiency. That deficiency was the result of income omissions in her and her spouse's joint income tax returns for the years 1980, 1981 and 1982. Emilia also argues that the negligence penalty assessed under 26 U.S.C. § 6653(a) was improper. We reverse.

1. T.C. Memo 1991 ¶ 361, 472.

## STATEMENT OF FACTS

Emilia married Erminio Pietromonaco ("Erminio") in 1940 at the age of 18. Emilia's formal education extended only through high school. The couple remained married for over fifty years until Erminio's death in 1992. During the marriage, Erminio handled all of the family's finances, while Emilia cared for their two daughters and maintained the household. Emilia was responsible for the household expenses, for which she wrote checks from a joint account at Security Pacific Bank. The expenses included groceries, utilities and the mortgage. Erminio was responsible for depositing funds into the Security Pacific account. Those were the funds known and available to her. He controlled the rest. Except for a three week stint in a shoe store, Emilia did not work outside the home and relied completely on Erminio's earning capacity.

Throughout Erminio's life, Emilia performed the responsibilities that had been hers for over 40 years, namely paying the household expenses and maintaining the house. As her daughter testified, Erminio

"wanted to be in charge of everything and he really didn't want my mother involved financially or with the business, and I guess she was typical in being a housewife. She enjoyed that and was content doing that."

In 1974, Erminio went into a partnership with his brother and opened Le Monaco's Hair Styling Shop ("Le Monaco's") in Westminster, California. Emilia (then at age 52), did not participate in the operation of Le Monaco's and rarely even visited the shop, which was 40 miles from their house. Erminio never discussed the shop with Emilia and she did not know how much her husband was making. In 1977, Erminio bought his brother's share in the shop and later sold a twenty-five percent interest to David Berru. Erminio operated the shop until 1986.

During the tax years spanning 1980 to 1982, Erminio and Emilia filed joint income tax returns which were prepared by Edward Wildrick, a bookkeeper for International Bookkeeping. Emilia's only participation in the execution of those returns was to provide Wildrick with a list of her household expenses. She and Erminio would visit Wildrick and Emilia would socialize with Wildrick's spouse while the men prepared the tax returns. Emilia signed the tax returns without question. She relied on the belief that "it was done by a bookkeeper and that should be sufficient."

On February 14, 1989, the Internal Revenue Service ("IRS") issued a joint notice of deficiency to Erminio and Emilia for the years 1980, 1981 and 1982. The IRS determined that taxable income from the operation of Le Monaco's had not been reported in each of those years.[2] As a result, Erminio and Emilia owed an additional $13,394 for 1980, $18,099 for 1981, and $13,915 for 1982. Later these amounts were adjusted so that the deficiencies were $10,814 (1980), $11,721 (1981), and $11,429 (1982). In addition, the IRS assessed negligence penalties under 26 U.S.C. § 6653(a). In sum, Erminio and Emilia owe the IRS $35,661.50.[3]

At trial, the only issue was whether Emilia was an innocent spouse as to all or part of the adjustments, including additions to tax. The Tax Court concluded that Emilia should have known that the amount of income reported on the tax returns was financially deficient. Moreover, the Tax Court found that it would not be inequitable to hold Emilia liable for the tax. Emilia timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 26 U.S.C. § 7482. "We review Tax Court decisions 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.' ... We will review a Tax Court's determination of relief under section 6013(e) for clear error." *Guth v.*

2. In 1980, they failed to report $40,176, $50,537 in 1981, and $41,121 in 1982.

3. In March, 1989, Erminio was diagnosed with Alzheimer's disease. At the time of trial, all of the couple's assets had been transferred to Emilia because Erminio was incompetent. He is now deceased.

*Commissioner,* 897 F.2d 441, 443 (9th Cir. 1990); *Clevenger v. Commissioner,* 826 F.2d 1379, 1382 (4th Cir.1987).

## DISCUSSION

### A. Innocent Spouse Relief Under Section 6013(e)

■ "An innocent spouse is relieved from liability for the tax on any understatement of a joint return, as well as any interest, penalties or other amount attributable to an omission from gross income for the taxable year...." Mertens, Law of Federal Income Tax § 55.181 (1991); *see* 26 U.S.C. § 6013(e)(1). The spouse must show that: (1) [the couple] filed a joint return, 26 U.S.C. § 6013(e)(1)(A); (2) the return contained a "substantial understatement of tax" attributable to errors the other spouse committed, 26 U.S.C. § 6013(e)(1)(B); (3) in signing the return [the innocent spouse] did not know or have reason to know of the substantial understatement, 26 U.S.C. § 6013(e)(1)(C); and (4) it would be inequitable to hold her liable for the deficiency in question, 26 U.S.C. § 6013(e)(1)(D). The person seeking relief from liability carries the burden of proving each element of section 6013(e)(1).

*Price v. Commissioner,* 887 F.2d 959, 961–62 (9th Cir.1989) (footnotes omitted). Both parties concede that the first two factors were satisfied. Only the third and fourth factors are at issue.

#### 1. *Lack of Knowledge, 26 U.S.C. § 6013(e)(1)(C)*

■ "A spouse has 'reason to know' of the substantial understatement if a reasonably prudent taxpayer *in her position at the time she signed the return* could be expected to know that the return contained the substantial understatement." *Price,* 887 F.2d at 965 (emphasis added); *Sanders v. United States,* 509 F.2d 162, 166–67 (5th Cir.1975) (remedial purpose of statute calls for reasonable person standard). The standard is objective because we look at the reasonably prudent taxpayer, but this objective standard is not an abstraction. It is the reasonably prudent taxpayer in the particular circumstances in which the taxpayer before us was placed.

We have held that several factors should be considered in determining whether a spouse has "reason to know" including: "(1) the spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances." *Price,* 887 F.2d at 965; *Stevens v. Commissioner,* 872 F.2d 1499, 1505 (11th Cir.1989).

The Tax Court has said that, "[a] key factor in deciding whether a spouse should have known of substantial understatements of tax is the *extent* that family expenses, about which the spouse had knowledge or awareness, *exceed reported income.*" *Hammond v. Commissioner,* 58 T.C.M. (CCH) 1196, 1199, 1990 WL 1107 (1990) (emphasis added) (citing *Jackson v. Commissioner,* 72 T.C. 356, 361, 1979 WL 3737 (1979)), *aff'd* 938 F.2d 185 (8th Cir.1991); *see* Mertens, Law of Federal Income Taxation § 55.188 at 330 (1991). "[W]here the spouse makes unusual or lavish expenditures, a taxpayer is on notice" that an income omission is probable. *Jackson,* 72 T.C. at 361; *see Clevenger,* 826 F.2d at 1382 (expenses to improve property were extreme and given taxpayer's occupational background, he should have known of erroneous deductions).

The Tax Court concluded that Emilia did not know of the understatement of income because she did not review the tax returns. Thus, the question was whether Emilia had "reason to know" of the omission. The Tax Court found that Emilia's highest education level was high school and that she was completely dependent on Erminio for financial support. Emilia's only involvement in the family's finances was limited to paying household expenses and she had nothing to do with Erminio's business and financial affairs. *See Botsaris v. Commissioner,* 56 T.C.M. (CCH) 168, 169–71, 1988 WL 93993 (1988) (spouse's full time responsibility was raising children and maintaining house). Those facts were supported by the record and weigh in favor of granting relief to Emilia, but standing

alone, they do not entitle her to innocent spouse status. *Stevens,* 872 F.2d at 1505–06. The Tax Court found that Emilia's lifestyle was modest and did not improve during the years at issue. *See Sanders,* 509 F.2d at 168 (even if standard of living generally improved, spouse not necessarily put on notice that income omitted). Finally, the Tax Court concluded that Erminio maintained total control over his business affairs. He was evasive with regard to his gambling winnings and losses. Those findings are supported by the record and also weigh in favor of Emilia's innocence. *See id.; Botsaris,* 56 T.C.M. (CCH) at 171; *Hinds v. Commissioner,* 56 T.C.M. (CCH) 104, 106, 1988 WL 92148 (1988) (fact that husband exerted total control over finances and standard of living remained constant supports innocent spouse finding).

Nevertheless, despite those findings, the Tax Court found that Emilia was not an innocent spouse on grounds that she should have known of the understatements because she "was well aware of the amount of monthly and yearly expenditures for household items. A cursory review of the returns would have alerted [Emilia] that the amount of income reported could not have substantiated the amount of household expenses incurred as well as monies spent on leisure." The Tax Court noted that in 1980, the deductible household expenses amounted to $10,111.[4] According to the bank pass book, Emilia wrote checks totalling $17,926.70 in 1980, $12,883 in 1981, and $16,465 in 1982.[5] The corresponding adjusted gross incomes reported were $9,224 in 1980, $9,581 in 1981, and $16,371 in 1982. Simple math indicates that Emilia overspent reported income by as little as $886 to as much as $8,702 in 1980, $3,302 in 1981, and $94 in 1982 in addition to her costs for food.[6] The Tax Court, relying on *Hammond* and *Jackson,* denied relief. That conclusion is not supported by the facts or the law.

■ Emilia had no control over the deposits to the checking account and only made sure that its balance was positive. There is no indication that Emilia or Erminio made unusual or lavish expenditures in the 1980 to 1982 period. They lived in the same house (*cf. Jackson,* 72 T.C.M. (CCH) at 361), drove the same cars (*cf. Malandro v. Commissioner,* 56 T.C.M. (CCH) 1577, 1580, 1989 WL 27840 (1989) (bought new cars each year)), and Emilia did not receive any gifts from Erminio (*cf. Stevens,* 872 F.2d at 1501 (spouse showered with jewelry)). Their lifestyle remained constant. They ate at the same simple places, bowled at the same alleys, and travelled only to Las Vegas as they always had. *See Botsaris,* 56 T.C.M. (CCH) at 171. The facts do not support the Tax Court's conclusion that Emilia should have been alerted to income omissions.

The extent of Emilia's overspending is not so extraordinary as to lead to the conclusion that a reasonable person in her circumstances would have been alerted to possible omissions of income, particularly in 1981 ($3,302) and in 1982 ($94). The Tax Court's conclusion is plausible only if we determine that, as a matter of law, any negative income should put any reasonable person on notice that reported income has been understated. That conclusion contradicts *Hammond* which states that the focus is on "the *extent* that family expenditures" exceed reported income. 58 T.C.M. (CCH) at 1199 (emphasis added). For example, in *Hammond,* "[i]n each year petitioners' expenditures were two or three times their reported income." *Id.* That did *not* include day-to-day expenses, such as food, utilities and auto expenses. In *Jackson,* taxpayers spent over $40,000 and reported only $10,458 in taxable income. 72 T.C. at 361. The government cites *Ayer v. Commissioner,* 58 T.C.M. (CCH) 681, 1989 WL 135776 (1989) and *Malandro.* In *Ayer,* the taxpayers' expenditures were approximately three to four times their reported

---

**4.** The Tax Court did not state the expenses for 1981 and 1982.

**5.** Those expenditures do not include payments for food, gasoline and other miscellaneous expenses.

**6.** Emilia stipulated that she spent approximately $3640 per year on groceries.

income. 58 T.C.M. (CCH) at 684.[7] In *Malandro,* the taxpayers' expenditures for each year at issue were approximately three and one-half times the reported income. 56 T.C.M. (CCH) at 1586.

In each of those cases, the extent to which the taxpayers' expenditures exceeded reported income was extraordinary. Here, the 1980 overage was approximately two times the reported income, and markedly lower in 1981 and 1982. If one considers amounts rather than percentages, the numbers are even less dramatic. In comparison to the cases relied upon by the government, the discrepancies were not extraordinary. In addition, in each of those cases the spouse was either educated, (*see Ayer,* 58 T.C.M. (CCH) at 683 (college) and *see Malandro,* 56 T.C.M. (CCH) at 1586 (college level business and accounting classes)), or the family's standard of living improved significantly (*see Hammond,* 58 T.C.M. (CCH) at 1198 and *see Jackson,* 72 T.C. at 358–59), or both. Emilia was not educated and her standard of living did not improve. Nor was the difference between the couple's spending and their cash income as large, even proportionally, as the difference between their spending and their taxable income. For example, in 1980, the taxable income on their 1040 tax return was picked up from schedule E, partnership income. The separate partnership return form 1065 showed $5104 in depreciation, a reduction in taxable income without a commensurate reduction in cash.

Moreover, even assuming Emilia knew her total expenses and she knew those expenditures exceeded the reported income, that knowledge, standing alone, does not preclude relief under 6013(e). In a society that relies heavily on credit, it is not uncommon for individuals to spend more than they earn during a week, month or year. Without more, it is unreasonable to assume that a negative cash flow necessarily implies that taxable income has not been reported. That inference is particularly weak in Emilia's case. Emilia and Erminio were in their late 50's or early 60's during 1980 to 1982 and had been married for nearly forty years. They had several savings accounts and had money invested in a CD. The negative cash flow was not necessarily alarming because Emilia

and Erminio had cash savings to continue living their modest lifestyle. That is especially true from Emilia's point of view because she only had access to the funds put into the household account by Erminio. Emilia and Erminio did not make unusual or lavish expenditures and their way of life remained constant. *See Botsaris,* 56 T.C.M. (CCH) at 171.

On these facts, at the times she signed the returns, Emilia had no reason to doubt the veracity of the reported income and had no reason to suspect that income had been omitted from the tax returns based solely on the fact that expenditures exceeded income. Thus, Emilia sustained her burden of showing she did not have reason to know that income had been omitted from her tax returns. That is to say, she behaved as a reasonably prudent taxpayer *in her position* would have behaved. *See Price,* 887 F.2d at 965. The Tax Court's determination to the contrary was clearly erroneous.

2. *Equitable Result, 26 U.S.C. § 6013(e)(1)(D)*

■ "The requirement that relief be granted 'only where it would be inequitable to hold the innocent spouse liable' lies at the heart of the section's history...." *Guth,* 897 F.2d at 443. "[I]t would not be inequitable to hold the other spouse liable for the deficiencies in tax if substantial benefits from the omissions in income were received." *Hammond,* 58 T.C.M. (CCH) at 1200; *Hinds,* 56 T.C.M. (CCH) at 106 (significant benefit is one factor that is relevant); *see Price,* 887 F.2d at 966 n. 12. But, "normal support is not a significant benefit." *Hinds,* 56 T.C.M. (CCH) at 107; *Sanders,* 509 F.2d at 168 (normal support is measured relative to each family's standard of living); Mertens, Law of Federal Income Taxation § 55.187 at 328–29.

In its response to Emilia's motion for reconsideration, the Tax Court repeated its prior reasoning and added that it would not be inequitable to deny relief because Emilia had enjoyed the fruits of Erminio's dishonesty. The Tax Court stated that on

---

7. Moreover, the spouse was educated and had been audited by the IRS on prior tax returns. The Tax Court found that she should have been

on notice that "the amounts on subsequent returns may not reflect reality." *Id.* at 684–85.

the reported income, Emilia "enjoyed dining out weekly, at least 4 trips to Las Vegas yearly, the expertise of a gardener, regular visits to the hair salon, and other leisure activities." The finding of enjoyment does not find support in the record.

In its *original* order, the Tax Court found that Emilia and Erminio maintained a "modest lifestyle." That lifestyle consisted of: (1) periodic trips to the hairdresser for Emilia (once a week but not every week); (2) bowling and eating out at cafeteria type restaurants twice weekly; and (3) hiring a gardener. The only "vacations" they took were visits to Las Vegas for "two days or so." In Las Vegas, they would visit Erminio's sickly brother. Emilia also played the 25 cent slot machines at the casinos, with a portion that Erminio gave her for that purpose.

During 1980 to 1982, Emilia's lifestyle did not improve or change. Erminio did not give any gifts to Emilia or make any lavish purchases. *See Hammond,* 58 T.C.M. (CCH) at 1200 (spouse bought luxury items with omitted income). The fact that they had a gardener is not particularly extravagant. *See Botsaris,* 56 T.C.M. (CCH) at 171 (hiring housekeeper was not extravagant). There is no indication that Emilia and Erminio were *not* doing exactly the same things before 1980. *See Hinds,* 56 T.C.M. (CCH) at 107. Moreover, Erminio did not use the tax benefits attributable to the understatements to purchase property in which Emilia received an ownership interest. *See id.; Clevenger,* 826 F.2d at 1382. Nor, even after she took control of Erminio's assets when he fell ill, did her lifestyle change. Rather, her modest style of living continued until her accounts were depleted—it appears that they had been by the time of the Tax Court's opinion in 1991. There is nothing to indicate that these accounts were the receptacles of the money Erminio diverted from his business. No one can know exactly where that money went but it is clear that he wrote checks for thousands of dollars in Las Vegas. Given those facts, it is difficult to imagine how Emilia actually benefited from Erminio's income omissions. *See Hinds,* 56 T.C.M. (CCH) at 107. The Tax Court's cryptic finding to the contrary was clearly erroneous.

Emilia has satisfied each of the requirements under section 6013(e)(1). She is an "innocent spouse" and should not be held liable for her tax liabilities and the penalties attributable to the income omissions. *See Price,* 887 F.2d at 966.

### CONCLUSION

During a long marriage Emilia relied upon Erminio to take care of her and the family. She was not made privy to his activities or financial affairs. Their relationship was what her daughter called "old-fashioned." It was based on a particular division of duties and responsibilities and on trust. Nothing extraordinary occurred to warn her that the pattern of her accustomed life style had changed. Nothing occurred that could be expected to make her think that Erminio was failing to report his income. Instead, she continued to live her normal, quiet, trusting existence until Erminio was stricken with a dread disease and she was pursued by the tax collector. She is the quintessential innocent, and the Tax Court clearly erred in finding the contrary.

**REVERSED.**