HARRIET SILVERMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Silverman v. Commissioner
Docket No. 18502-91
United States Tax Court
T.C. Memo 1994-153; 1994 Tax Ct. Memo LEXIS 154; 67 T.C.M. (CCH) 2631; April 13, 1994, Filed *154 For petitioner: Bertram Gezelter. For respondent: Andrew Mandell. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined a deficiency of $ 107,280 in petitioner's 1977 Federal income tax. [1] The sole issue for decision is whether, under section 6013(e), [2] petitioner is entitled to "innocent spouse" relief from joint and several liability for the deficiency. For the reasons that follow, we hold that petitioner is not entitled to such relief. FINDINGS OF *155 FACT Petitioner was a resident of Beverly Hills, California, when she filed the petition in this case. Petitioner married Jerome Silverman in 1955, and she was married to him in 1977, the year at issue, and 1978, the year in which the joint income tax return in issue was executed and filed. From 1974 through January 1987, when petitioner and Mr. Silverman were divorced, their marital relationship was, at times, tumultuous and marked by periods of separation. Petitioner's Background
Petitioner graduated from Bay Shore high school in Long Island, New York, in 1952. Sometime in 1951 or 1952, petitioner met Mr. Silverman and decided not to go away to college, as she had originally planned. Instead, she attended the Tobe Coburn School for Fashion Careers in New York City, graduating therefrom in 1954. From 1954 to 1957, petitioner was the publicity and promotions director of Rogers Lingerie. From 1957 through 1961, petitioner and Mr. Silverman had three daughters. Until 1974, the Silverman family lived in Brightwaters, Long Island, New York. In 1957, following the birth of petitioner's first child, petitioner completed a correspondence course in interior design. Petitioner *156 subsequently worked as an interior designer in the New York area. After the children reached school age, petitioner began taking courses at Dowling College in Oakdale, New York. In 1972, petitioner graduated from Dowling College with a bachelor of science degree in social science. In 1974, petitioner received a masters of science degree in counseling from C.W. Post College. [3] However, it also was in 1974 that petitioner's life began to "fall apart". In the early 1970s, Mr. Silverman owned and operated an auction and appraisal business with offices in New York and Florida. [4] In 1974, Mr. Silverman began to experience financial difficulties because he had to make payments on loans that he had guaranteed. These financial difficulties affected Mr. Silverman's business, forcing him to relocate to Florida while petitioner closed his New York office. Petitioner and Mr. Silverman *157 separated later that year, as a result of his extramarital affair with an employee. Mr. Silverman's financial difficulties also forced petitioner to sell the family house in Brightwaters, antiques, and other belongings. After petitioner paid the mortgage on the house, she had about $ 12,000 left. Petitioner used much of the $ 12,000 to move to Florida with the children. Petitioner gave Mr. Silverman the remaining proceeds from the sale of the house to help him pay his business debts. The Silverman family's financial difficulties continued after they arrived in Florida. Mr. Silverman's business outlook did not improve, and petitioner was not able to find a job. The Silverman children, using money they earned by babysitting, and Mr. Silverman helped petitioner pay her rent, and she was on food stamps. [5]
*158 Petitioner eventually got a job doing social work for a Government agency in Florida. However, petitioner's income was so modest that she still could not pay her rent without help from Mr. Silverman and the children. In 1976, Mr. Silverman moved to California using money that he borrowed from the children. In California, Mr. Silverman found a partner, Michael Lewis, and they started a business and organized a corporation, Guarantee Appraisal Corp. (GAC), to provide appraisals of the residual values of tangible personal property that would be guaranteed by insurance policies. Mr. Silverman was in charge of the GAC's business operations. Petitioner's 1977 Lifestyle
Four or five months after Mr. Silverman moved to California, petitioner and the children also relocated to California, and the Silverman family was reunited in one household. As a result, petitioner's lifestyle returned to a level comparable to her pre-1974 lifestyle in New York. During 1977, petitioner and Mr. Silverman lived with their three daughters in a house that he rented in Beverly Hills for $ 1,500 a month. Mr. Silverman furnished the house with leased furniture. Petitioner and Mr. Silverman were *159 members of the Sand and Sea Country Club, and they paid member fees in excess of $ 900 for 1977. During 1977, petitioner and Mr. Silverman also leased at least one car, and Mr. Silverman gave petitioner $ 26,000 in cash ($ 500 per week) to pay for food, maid service, gas, and clothes. In July 1977, petitioner and Mr. Silverman signed a contract to purchase, for $ 750,000, [6] a house on Lago Vista Drive in Beverly Hills. Petitioner signed the purchase contract even though she was opposed to purchasing the Lago Vista house because she did not think that she and Mr. Silverman could afford it. Under the purchase contract, petitioner and Mr. Silverman paid David Brown, the owner of the Lago Vista house, a cash downpayment of at least $ 25,000 in 1977. The remainder of the purchase price *160 was to be composed of approximately $ 80,000 in cash, to be paid at or before closing, a $ 300,000 mortgage from Great Western Savings and Loan, and a promissory note secured by a second deed of trust to Mr. Brown for the remaining amount. The monthly payments on the $ 300,000 mortgage would have amounted to $ 2,522.58, and the annual payments to Mr. Brown would have been $ 50,000, plus 10 percent of the outstanding balance of the promissory note. The mortgage application, signed by petitioner and Mr. Silverman under penalties of perjury, stated that Mr. Silverman had monthly gross income of $ 10,000. In August 1977, petitioner and Mr. Silverman took possession of the Lago Vista house primarily to make extensive improvements on it, and it remained in their possession through March 31, 1978. In return therefor, petitioner and Mr. Silverman agreed to pay Mr. Brown rent of $ 75,000. [7] Petitioner and Mr. Silverman never took title to the Lago Vista house because Mr. Brown backed out of the deal sometime in 1978. *161 During 1977, petitioner and Mr. Silverman spent more than $ 67,500 on improvements to the Lago Vista house. The improvements to the Lago Vista house were made under petitioner's supervision, and she was aware of their approximate cost. However, the bills for the Lago Vista house improvements, like the bills for most of the family's major expenses, including rent, car rental payments, country club fees, and doctors' charges, were sent to Mr. Silverman at his office. Petitioner's Knowledge of the Family's Finances and Tax Returns
Petitioner did not participate in the management or day-to-day operations of GAC, and she did not work outside the home after she moved to California. However, petitioner did help Mr. Silverman entertain business clients. Mr. Silverman generally did not discuss the family finances with petitioner. However, petitioner knew that Mr. Silverman was paying $ 1,500 a month to rent the Beverly Hills house during 1977, and that she was receiving $ 500 per week from Mr. Silverman to pay household expenses. Petitioner also knew that Mr. Silverman was making significant expenditures to rent the furniture and car they were using, and that they had made a *162 substantial investment in the Lago Vista house, including a cash downpayment of at least $ 25,000, and the cost of the improvements made under her supervision. Neither petitioner nor Mr. Silverman applied for or obtained any significant loans, except for the mortgage on the Lago Vista house, during 1977. Because Mr. Silverman suffers from a form of dyslexia, he always arranged to have an employee maintain the family financial records and pay the family bills. For the same reason, Mr. Silverman also always hired an accountant to prepare his income tax returns, including the joint return for the year at issue. Sometime early in 1978, Mr. Silverman gave petitioner a blank 1977 Federal income tax return to sign. Petitioner did not consider this to be peculiar because, throughout their marriage, Mr. Silverman always had given her a blank income tax return to sign, which he would then give to his accountant to complete. Petitioner signed the blank tax return without asking Mr. Silverman any questions, and she gave it back to Mr. Silverman to give to the accountant to complete. Petitioner did not review her completed 1977 Federal income tax return before it was filed. Petitioner *163 and Mr. Silverman reported gross income of $ 28,584 on their 1977 Federal income tax return, composed of commission income from GAC in the amount of $ 26,976, and rental income on a New York property of $ 1,608. Petitioner and Mr. Silverman did not report additional commission income of $ 215,235 that he received from GAC during 1977. Petitioner and Mr. Silverman did not report or have any interest or dividend income during 1977. Mr. Silverman has admitted that he underreported his 1977 income by $ 215,235 and that he did so with the intent to evade a tax known to be owing. In the mid 1980s, Mr. Silverman pleaded guilty, in Federal District Court, to willfully attempting to evade Federal income tax for 1977 under section 7201. Mr. Silverman received a suspended sentence of 2 years' imprisonment, and was put on probation for 3 years and four months. In 1987, Mr. Silverman signed a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, in which he agreed to a $ 107,280 increase in his 1977 income tax and a fraud addition to tax of $ 53,640. Respondent has not determined any fraud addition against petitioner. OPINION
*164 Section 6013(a) provides that spouses generally may file a joint Federal income tax return. If they file a joint income tax return, "the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several." Sec. 6013(d)(3). However, under the "innocent spouse" provisions of the Internal Revenue Code, a spouse may be relieved of this joint and several liability for tax if he or she can show that: (1) A joint Federal income tax return was filed for the year in issue; (2) there was a substantial understatement of tax on that return attributable to grossly erroneous items of the other spouse; (3) in signing the income tax return, he or she did not know or have reason to know of the substantial understatement; and (4) it would be inequitable to hold him or her liable for the deficiency in question. Sec. 6013(e); Guth v. Commissioner, 897 F.2d 441, 443 (9th Cir. 1990), affd. T.C. Memo. 1987-522; Griner v. Commissioner, T.C. Memo. 1990-301, affd. without published opinion 951 F.2d 360 (9th Cir. 1991). A spouse seeking relief *165 under section 6013(e) has the burden of proving that each requirement of the statute has been satisfied. Price v. Commissioner, 887 F.2d 959, 962 (9th Cir. 1989), revg. on other grounds an Oral Opinion of this Court; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). The relief-seeking spouse's failure to satisfy any requirement of section 6013(e) will preclude her from qualifying for relief. Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Grubich v. Commissioner, T.C. Memo. 1993-194. The parties agree that petitioner and Mr. Silverman filed a joint income tax return for 1977, and that there was a substantial understatement of tax on that return. The parties further agree that the understatement of tax was attributable to a grossly erroneous item of Mr. Silverman. However, the parties disagree on whether petitioner, in signing the income tax return, knew or had reason to know of the substantial understatement of tax, and whether *166 it would be inequitable to hold petitioner liable for the deficiency at issue. Although the record in this case, as it was developed at trial, contains evidence bearing on both requirements of section 6013(e) at issue, petitioner's argument, on brief, focused primarily on whether it would be inequitable to hold her liable for the deficiency. However, we need not decide that issue because we find that petitioner had reason to know of the substantial understatement of tax within the meaning of 6013(e)(1)(C). As a result, petitioner cannot satisfy each requirement of 6013(e), and she is not entitled to "innocent spouse" relief. Cf. Bokum v. Commissioner, 992 F.2d 1132, 1134 (1993), affg. 94 T.C. 126 (1990); Park v. Commissioner, T.C. Memo. 1993-252. Petitioner signed her 1977 income tax return before it had been prepared, and she did not review the return prior to the time it was filed. Petitioner therefore did not have actual knowledge of the substantial understatement of tax on her 1977 Federal income tax return. Our attention therefore shifts to whether petitioner had reason to know of *167 the substantial understatement in tax. A taxpayer has reason to know of a substantial understatement of tax if a reasonably prudent taxpayer in his or her position could be expected to know that the stated tax liability was erroneous or that further investigation was warranted. Bokum v. Commissioner, 94 T.C. at 153; see also Pietromonaco v. Commissioner, 3 F.3d 1342, 1345 (9th Cir. 1993), revg. on other grounds T.C. Memo. 1991-361 and T.C. Memo. 1991-472. If the substantial understatement of tax is attributable to an omission of income, the relief-seeking spouse has reason to know of the understatement if he or she has reason to know of the transaction that gave rise to the understatement. Guth v. Commissioner, 897 F.2d at 444 (citing Purcell v. Commissioner, 826 F.2d 470 (6th Cir. 1987), affg. 86 T.C. 228 (1986)); Smith v. Commissioner, 70 T.C. 651, 673 (1978). We may impute to the relief-seeking spouse constructive knowledge of the transaction *168 if he or she turned a blind eye to facts within his or her reach that would have put a reasonably prudent taxpayer on notice to inquire further. McCoy v. Commissioner, 57 T.C. 732, 734 ((1972); see also Price v. Commissioner, supra at 965; Adams v. Commissioner, 60 T.C. 300, 303 (1973). In determining whether the relief-seeking spouse had reason to know of the substantial understatement of tax, courts consider the following factors: (1) The relief-seeking spouse's level of education, (2) his or her involvement in the financial and business activities of the family, (3) any substantial unexplained increase in the family's standard of living, and (4) the culpable spouse's evasiveness and deceit about the family's finances. Pietromonaco v. Commissioner, supra at 1345; Price v. Commissioner, supra at 965; Bokum v. Commissionor, 94 T.C. at 148. However, no single factor or set of factors is dispositive and we do not determine whether the relief-seeking spouse had reason to know of the substantial *169 understatement of tax by counting the number of factors tending to cut in petitioner's favor. See Guth v. Commissioner, supra at 444; Sanders v. United States, 509 F.2d 162 (5th Cir. 1975); see also Pappadio v. Commissioner, T.C. Memo. 1992-568. Rather, the issue is a factual question to be determined after a review of the entire record. Guth v. Commissioner, supra at 443-444; Park v. Commissioner, supra.
It is well settled that petitioner would not qualify for section 6013(e) relief merely because she signed a blank return and relied on Mr. Silverman and his accountant to complete it properly, Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Park v. Commissioner, supra, and she has not argued to the contrary. Petitioner had a duty to review her completed 1977 income tax return, and she is not relieved of that obligation because of her reliance on Mr. Silverman and his accountant to *170 complete the return properly. Hayman v. Commissioner, supra at 1262; Park v. Commissioner, supra; see also United States v. Boyle, 469 U.S. 241, 251-252 (1985). Petitioner therefore is deemed to have constructive knowledge of the contents of her 1977 income tax return, even though she signed the return before it was prepared and did not review the completed return before it was filed. Hayman v. Commissioner, supra at 1262; Levin v. Commissioner, T.C. Memo. 1987-67. Our inquiry into whether petitioner had reason to know of the substantial understatement of tax takes into account her level of education and her involvement in the financial and business activities of the family. Although petitioner is an intelligent, well-educated woman, she has not taken any courses in finance or financial planning. Petitioner, for most of her adult life, including all relevant years, depended on Mr. Silverman for financial support. Petitioner never participated in the management or operation of Mr. Silverman's business and financial *171 affairs, and, in 1977, her involvement in the family finances was limited to paying household expenses. These facts are indicative of a spouse who does not have reason to know of a substantial understatement of tax. However, these facts standing alone do not entitle petitioner to relief under section 6103(e). See Pietromonaco v. Commissioner, supra at 1345-1346 (citing Stevens v. Commissioner, 872 F.2d at 1505-1506); Pappadio v. Commissioner, supra.
Petitioner averted her eyes from facts that would have given her reason to know of the unreported income. Cf. Pappadio v. Commissioner, supra; Ayer v. Commissioner, T.C. Memo. 1989-614. If petitioner had made even a cursory examination of the 1977 income tax return, she would have seen that Mr. Silverman's gross income reported on the return was substantially less than his gross income reported on the mortgage application. A person of average intelligence also would have known that the modest income of $ 28,584 reported on petitioner's 1977 income tax return was insufficient *172 to support the substantial cash expenditures she and Mr. Silverman made during that year. During 1977, petitioner and Mr. Silverman spent over five times their reported income, at least $ 137,400, on rent, country club fees, household expenses, the downpayment on a new house, and the improvements thereon. A reasonable person in petitioner's position should have known that she and Mr. Silverman were spending much more money than was available to them based on their reported income. Cf. Hammond v. Commissioner, T.C. Memo. 1990-22, affd. without published opinion 938 F.2d 185 (8th Cir. 1991); Ayer v. Commissioner, T.C. Memo. 1989-614. Although petitioner and Mr. Silverman were not living a particularly lavish or extravagant lifestyle, petitioner must have realized that their standard of living was noticeably higher in 1977 than it was in the years immediately preceding, and she should have known that they were spending substantially more money than they reported on their 1977 income tax return. Petitioner, in the course of one year, went from needing help from Mr. Silverman and her minor daughters *173 to pay her rent to contractually obligating herself to purchase a $ 750,000 house in Beverly Hills. Petitioner also went from being unemployed and on food stamps to being a member of a country club and having $ 500 cash to spend on the weekly household expenses. Under the circumstances, petitioner had reason to know that there had been a significant increase in the family's spending power. In our credit economy, individuals sometimes spend more than they earn during a week, month, or year, Pietromonaco v. Commissioner, 3 F.3d at 1347, and for some it is a way of life. Petitioner and Mr. Silverman, however, had no savings, the net proceeds from the sale of her Brightwaters house were almost all spent on her move to Florida and Mr. Silverman's attempt to save his Florida business, and, except for the mortgage on the Lago Vista house, neither petitioner nor Mr. Silverman applied for or obtained any significant loans during 1977. A year earlier, petitioner had been unemployed, on food stamps, and needed help from Mr. Silverman and her children to pay her rent. Petitioner also knew that Mr. Silverman had continuing financial difficulties in 1976, and *174 that he had borrowed their daughters' babysitting money to relocate to California. Thus, on the record before us, it is clear that petitioner and Mr. Silverman could not have made the expenditures they did without a corresponding increase in income, compare Ayer v. Commissioner, supra with Pietromonaco v. Commissioner, supra at 1347, and petitioner had to have been aware of this. In sum, the income reported on petitioner's 1977 income tax return was insufficient to support the improvement in her lifestyle from 1976 to 1977. Petitioner knew that neither she nor Mr. Silverman had any savings and that they had made substantial cash outlays on the Lago Vista house. Petitioner also knew that she and Mr. Silverman had reported, on their mortgage application, under penalty of perjury, that his gross income was no less than $ 120,000, an amount substantially in excess of his gross income as reported on their 1977 income tax return. Under the circumstances, petitioner had reason to know that further inquiry was warranted, and that inquiry would have told her that the gross income reported on the joint income tax return *175 was much less than Mr. Silverman's gross income enjoyed by the Silverman family during the year in question. In light of all the facts and circumstances, including petitioner's failure to inquire about the modest income reported on her 1977 income tax return, we hold that she had reason to know of the substantial understatement within the meaning of section 6013(e)(1)(C). Cf. Adams v. Commissioner, 60 T.C. at 303; Ayer v. Commissioner, supra. Accordingly, petitioner does not qualify for "innocent spouse" relief under section 6013(e). To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. Although petitioner and Jerome Silverman filed a joint Federal income tax return for 1977, respondent sent the notice of deficiency only to petitioner. This is because, in 1987, Mr. Silverman and respondent executed a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax, increasing Mr. Silverman's 1977 tax liability by the amount of the deficiency herein, also agreeing to a fraud addition.↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for 1977.↩
3. Petitioner's education at Tobe Coburn, Dowling College, and C.W. Post College did not include any courses in finance or financial planning.↩
4. Although Mr. Silverman is a law school graduate, he has never practiced law and, during all relevant years, his principal business was that of auctioneer and appraiser.↩
5. Petitioner and the children did not live in the same Florida household as Mr. Silverman.↩
6. Although the stated purchase price was $ 750,000, the mortgage application completed by petitioner and Mr. Silverman indicate that the total consideration to be paid was $ 705,000. The parties have not explained this discrepancy.↩
7. There is no evidence in the record that petitioner and Mr. Silverman paid Mr. Brown the $ 75,000.↩