GWENDOLYN G. THOMASON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thomason v. Commissioner
Docket No. 8601-92
United States Tax Court
T.C. Memo 1994-418; 1994 Tax Ct. Memo LEXIS 427; 68 T.C.M. (CCH) 517; August 22, 1994, Filed *427 Decisions will be entered for petitioner for 1983 and 1984 and for respondent for 1985. For petitioner: Anthony C. Galier. For respondent: Edith F. Moates. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined deficiencies in, and additions to, petitioner's Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661(a)
1983
$ 518,320
$ 25,916 *
$ 129,580
1984
239,733
11,987 *
59,933
1985
146,165
7,308 *
35,239
* Amount equal to 50 percent of the interest due
on that part of the underpayment attributable to
negligence or intentional disregard of the rules or
regulations, determined to be $ 518,320, $ 239,733,
and $ 140,956, respectively.
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. Petitioner concedes all of the adjustments made by respondent in the statutory notice of deficiency. Petitioner, however, is proceeding on the basis that she is entitled to relief from the determined *428 deficiencies and additions to tax as an innocent spouse under section 6013(e). Thus, the issue for decision is whether petitioner qualifies for innocent spouse relief under section 6013(e) for the taxable years at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Gwendolyn G. Thomason was a resident of Okmulgee, Oklahoma, at the time of filing the petition in this case. Petitioner filed joint Federal income tax returns with her husband, Robert L. Thomason, Jr. (Thomason), [1] for the taxable years 1983, 1984, and 1985. Petitioner was graduated from high school in 1972, where she made average to below-average grades. Petitioner took basic math classes and attended summer *429 school when she did not pass a science class. After graduation, petitioner married and had two children, Brian and Melissa. She was divorced from her first husband, Clifford Huddleston, in 1976. Shortly thereafter, petitioner attended cosmetology school for 1 year. The cosmetology school did not give instruction on how to operate a salon or how to keep books and records for a business. Petitioner worked as a hairdresser for JJ Hair Salon in 1977, 1978, 1979, and part of 1980. In 1979, petitioner secured a loan of $ 22,500 from Citizens Bank of Okmulgee, Oklahoma. The proceeds of that loan were used to purchase her personal residence at 202 Kern, Okmulgee, Oklahoma. During this time, petitioner filed individual income tax returns that had been prepared by her father's certified public accountant. She knew that she had a duty to file tax returns. Petitioner married Thomason on August 1, 1980, in a ceremony in Branson, Missouri. Thomason was graduated from college and had majored in business. Thomason worked in the financial industry as a loan originator, working with or for numerous banks and other financial institutions. He worked at United Mortgage in Oklahoma City and *430 later became the president of Territory Savings & Loan Association (Territory S&L) in Seminole, Oklahoma. During the years at issue, Thomason also was involved in a number of business ventures: Executive Aero Service, Classic Car Co., Shear Designs, Thomason Properties, FTW Partnership, and Sooner Building Materials. Petitioner was not involved in, and knew nothing about, any of these business ventures. Petitioner and her family lived an average middle-class lifestyle prior to and during the taxable years at issue. When petitioner and Thomason married in 1980, they and petitioner's two young children, then approximately aged 4 and 6, moved into a three-bedroom brick house in Okmulgee, Oklahoma (the Okmulgee house). This house had been built by Thomason and his previous (second) wife, who deeded it to him during their divorce. The Okmulgee house sits on 10 acres and initially had three bedrooms, three porches, and an attached garage. Behind the house, there is a 19' x 39' in-ground, vinyl-lined swimming pool as well as a five-stall horse barn. The attached garage was subsequently converted into two additional bedrooms when petitioner and Thomason had their three children, Bo, *431 Brock, and Michelle. These three children were born about 1981, 1983, and 1984, respectively. In 1981, petitioner and Thomason also built a two-story, three-bedroom cabin on Lake Tenkiller. The family went to the cabin for the weekend approximately once a month. The purchase of the property was commenced in 1980, prior to petitioner's marriage to Thomason, and was titled in petitioner's prior married name, Gwendolyn Gail Huddleston. Thomason handled all of the loan documentation, and his post office box was given as petitioner's address. At trial, petitioner did not recognize her signature on some of the documents presented for her identification, even though the documents were notarized. [2]
*432 Petitioner drove a used car. She bought clothes for herself and the children at J.C. Penney's, Sears, and Wal-Mart, and she made some of their clothes. The family did not eat out often. When they did, they went to McDonald's. Petitioner had a house cleaner come to the house once a month and for a seasonal cleaning. Petitioner did the gardening and lawn mowing herself. At the time of her marriage to Thomason, petitioner was employed outside of the home. Shortly after their marriage, Thomason wanted petitioner to quit working for JJ Hair Salon and to open her own salon in the same office building in which he conducted business. In July of 1981, petitioner purchased equipment and began operating a beauty salon, Shear Designs by Gwen & Co. She closed that business in approximately November of 1982, a few months before Brock's birth. At that time, petitioner gave the salon equipment to Thomason to do with it as he decided. Thomason handled the checking account and finances of Shear Designs by Gwen & Co. Petitioner was not involved with her husband's business, also named Shear Designs, during the taxable years at issue. [3] Petitioner was not employed outside of the home during *433 those years and had no income. In the first part of 1983, petitioner and Thomason moved to Yukon, Oklahoma. They lived in a three-bedroom house in Yukon for about 6 months and then moved to Oklahoma City, where they lived in another three-bedroom house. Petitioner does not know if these homes were purchased or rented. In May of 1984, in connection with Thomason's employment as the president of Territory S&L, petitioner and Thomason moved to Seminole, Oklahoma, where they bought a three-bedroom house with a converted garage. In December of 1985, they moved from Seminole back to the Okmulgee house. During all of these moves, petitioner and Thomason had retained the Okmulgee house. The Okmulgee house remained vacant and was not rented during their absences. In the period of 1983 through 1985, the family's *434 lifestyle did not significantly change. Petitioner was a homemaker and did not work outside of the home. She continued to buy clothes from J.C. Penney's, Wal-Mart, and Sears, and to make some of the clothes. Petitioner had a woman clean the house once a month. Petitioner continued to do her own grocery shopping and gardening. The family borrowed money to purchase a new 1984 model year Suburban automobile. During this time, petitioner spent money on basic living necessities. Her monthly expenditures generally were less than $ 500, most of which was spent for groceries, for minor household expenses, and for the children's needs. During the years at issue, petitioner owned two short fur coats, a red fox and a light brown mink, which were gifts from her husband. She gave the light brown mink coat to her mother, but got it back from her mother when the bank later sought to repossess it. Petitioner also had a diamond necklace, which was a gift from her husband. Petitioner accompanied her husband on business trips in his airplane approximately once a month. Petitioner and Thomason had a happy marriage and got along well, but they did not discuss financial matters. Thomason received *435 the bank statements, made deposits into the checking accounts, paid the major bills, and balanced the family checkbooks. Specifically, he made all mortgage payments and loan payments. He would open bank accounts and bring signature cards home for petitioner's signature. Petitioner had one credit card at the time, but she had no idea what the balances on that credit card were. The bank records and credit card statements were kept in Thomason's office -- he had control over them, and petitioner did not have access to any of the family's financial records. [4] Petitioner did not inquire into Thomason's financial transactions because she would not have understood them anyway. She trusted her husband to handle everything. Thomason borrowed money to make large purchases, and petitioner signed whatever documents Thomason instructed her to sign. *436 Thomason was terminated from his position as the president of Territory S&L in December of 1985. It was alleged that Thomason had given improper loans to friends and family members, had embezzled money, and had engaged in insider trading with a company in Arkansas. Petitioner knew that these allegations were the bases of her husband's termination from his position. Petitioner also came to know that Thomason was being investigated by the Federal Savings and Loan Insurance Corporation (the FSLIC) and the Federal Bureau of Investigation (the FBI), but no one from those agencies ever contacted her or interviewed her. She became aware of the investigations when she was contacted at the end of 1985 by an attorney of Territory S&L, because Thomason had borrowed money for an automobile in her name and another automobile that they had bought for her younger brother. In early 1986, Territory S&L took foreclosure action to recover its losses on loans originated by Thomason. This action was pursued in conjunction with the FBI investigation of Thomason. An assets hearing was held, and many of the Thomasons' assets, including petitioner's two fur coats and diamond necklace, were repossessed *437 by Territory S&L. The record in this case does not disclose the outcome of the FBI and FSLIC investigations of Thomason. Petitioner returned to work in 1987 when she bought a hair salon with a loan from the Morris Bank. When Thomason died in a plane crash in January of 1991, there was approximately $ 1,000 in their bank account. Petitioner was left with her Suburban vehicle, with a loan balance of $ 1,000 still outstanding on it; that loan balance was paid off with a credit life insurance policy. Thomason did not leave petitioner any real estate, stocks, or bonds. Petitioner did not collect any insurance as a result of her husband's death. In 1986 or 1987 Thomason had adopted petitioner's two children from her previous marriage, and in November of 1989, he transferred the Okmulgee house into a trust for all five of the children. He designated his father as the trustee. At the time of the trial, petitioner and her five children (ages 9, 10, 12, 17, and 19) were living in that house, and petitioner was making the monthly mortgage payments on the house. Petitioner's income from her hair salon ($ 800), plus the Social Security payments to her as Thomason's widow ($ 300) and *438 to the children ($ 1,200) totals about $ 2,300 per month. Thomason's certified public accountant, Jack Olesk (Olesk), prepared the 1983, 1984, and 1985 joint Federal income tax returns at issue in this case. Petitioner did not meet with Olesk during or after the time the tax returns were prepared. Thomason provided all of the information that Olesk used for preparation of the returns. In 1986 and 1987, when the Internal Revenue Service (IRS) audit of the years at issue began, petitioner and Thomason executed powers of attorney for Olesk to handle the audit. On January 4, 1989, IRS summonses were served on petitioner at her hair salon. Petitioner gave them to her husband to handle. Petitioner never asked her husband about any financial or tax matters at any time. Petitioner did not meet with Olesk at any time during the audit or even after the death of her husband in 1991. She did have a telephone conversation with Olesk concerning his continuing representation of her in the audit after Thomason's death. However, Olesk withdrew from representation, apparently due to petitioner's inability to pay his fees. On March 22, 1991, petitioner met with an IRS revenue agent for an *439 interview concerning the years at issue, but she could not provide any documents or information to the agent. The notice of deficiency was issued on January 29, 1992. OPINION The only issue is whether petitioner qualifies for innocent spouse relief under section 6013(e). When a husband and wife file a joint return, each is jointly and severally liable for the amount of tax due. Sec. 6013(d)(3). However, section 6013(e) relieves a spouse of joint liability if he or she meets its requirements. Under section 6013(e), a person seeking innocent spouse status must meet four prerequisites in order to be granted relief from liability for deficiencies and any additions to tax. First, the spouses must have filed joint returns for the taxable years at issue. Second, there must have been substantial understatements of tax attributable to the grossly erroneous items of the culpable spouse. Third, the spouse seeking relief must establish that he or she did not know, or have reason to know, of the substantial understatements. Last, considering all of the facts and circumstances, it must be inequitable to hold the spouse seeking relief liable for the deficiencies and additions attributable *440 to the substantial understatements. Sec. 6013(e)(1); Flynn v. Commissioner, 93 T.C. 355, 359 (1989). The spouse claiming such relief has the burden of proving that he or she has satisfied each statutory requirement of section 6013(e); a failure to prove any one of the statutory elements will prevent him or her from qualifying for relief. Rule 142(a); Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). There is no dispute that the first two requirements of section 6013(e) have been met. The parties agree that petitioner and Thomason filed joint Federal income tax returns for the years at issue. The parties also agree that, on the 1983, 1984, and 1985 tax returns, there are substantial understatements of tax attributable to grossly erroneous items of Thomason. However, respondent contends that petitioner either knew or had reason to know of the business transactions of her husband and consequently of the grossly erroneous *441 items on the joint tax returns. Respondent also asserts that, under the existing facts and circumstances, it would not be inequitable to hold petitioner liable for the deficiencies and additions in this case. In considering cases of this nature, this Court is mindful that, in enacting section 6013(e), Congress intended to remedy a perceived injustice, and we should not hinder this intent by applying an unduly narrow or restrictive reading of the section. Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975); accord Allen v. Commissioner, 514 F.2d 908, 915 (5th Cir. 1975), affg. in part and revg. in part 61 T.C. 125 (1973). [5]
1. Knowledge of the Grossly Erroneous Items
The parties agree that, at the time she signed the 1983 and 1984 tax returns, petitioner had no actual knowledge of the omissions of income and improper deductions *442 claimed by Thomason. Respondent contends, however, that petitioner had reason to know and also that, when petitioner signed the 1985 return on October 15, 1986, she either knew or had reason to know of the grossly erroneous items for that year because she knew that Thomason was under investigation by the FBI and the FSLIC for embezzlement and insider trading. Petitioner must establish that, in signing the returns, she did not know, or have any reason to know, that understatements of income or claims to improper deductions existed on the 1983, 1984, and 1985 joint tax returns. Sec. 6013(e)(1)(C). In determining whether petitioner had reason to know of the substantial understatements of tax, the test is whether a reasonably prudent person under petitioner's circumstances (e.g., intelligence, emotional state, level of involvement in the financial transactions giving rise to the income), at the time of signing the return, could be expected to know of the substantial understatements or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), *443 affg. in part and revg. and remanding in part T.C. Memo. 1984-310; Bokum v. Commissioner, 94 T.C. at 148. Significant factors in determining whether a spouse had reason to know of a substantial understatement of tax or improper deductions include: (1) the alleged innocent spouse's participation in business affairs or bookkeeping ( Quinn v. Commissioner, 62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975)); (2) the culpable spouse's refusal to be forthright concerning the couple's income ( Adams v. Commissioner, 60 T.C. 300 (1973)); (3) the presence of unusual or lavish expenditures [6] ( Mysse v. Commissioner, 57 T.C. 680, 699 (1972)); and (4) the taxpayer's level of education ( Stevens v. Commissioner, 872 T.C. at 1505). The issue is a question of fact to be determined after a review of the entire record. Guth v. Commissioner, 897 F.2d 441, 443-444 (9th Cir. 1990), affg. T.C. Memo. 1987-522; Shea v. Commissioner, 780 F.2d at 566. *444 Respondent points to various transactions, including the purchase of the property at Lake Tenkiller, as evidence of petitioner's knowledge of and participation in Thomason's questionable business transactions, or at the least, a reason to know of these problems. See supra note 2. We are not willing to draw such inferences, particularly from this remote transaction that occurred about the time of her marriage to Thomason in 1980. Petitioner consistently and credibly testified that she signed whatever she was instructed to sign because she had no reason to question her husband's instructions. She further testified that she did not recognize many documents on which her purported signature appears. In our view, petitioner *445 did not know, or have any reason to know, that Thomason was understating income or claiming improper deductions on the couple's tax returns for the 1983 and the 1984 taxable years. We found petitioner to be a credible witness, and we conclude that, at the time she signed the 1983 and 1984 tax returns at issue, petitioner had neither actual knowledge, nor any reason to know, of the grossly erroneous items attributable to her husband's questionable business transactions. We conclude, however, that, for the 1985 taxable year, petitioner did have reason to know of Thomason's omitted income and improper deductions on the 1985 tax return. In reaching these conclusions, we considered the roles played by petitioner and Thomason in business activities and decisions. During the years at issue, petitioner had no knowledge of or involvement with her husband's businesses. Petitioner had little interest in or knowledge of financial matters and no bookkeeping training. Thomason made all of the major financial decisions for the family, albeit he gave petitioner signatory powers on the checking accounts. Thomason paid all of the major family bills, such as the mortgage, the credit card bills, *446 loan payments, and the like. Petitioner wrote checks for small amounts to purchase groceries, pay minor household expenses, and purchase items for the children. Furthermore, there is no evidence of lavish gifts or a lavish lifestyle. Petitioner shopped at stores with moderately priced merchandise. She did not travel on exotic trips, but merely accompanied her husband on business trips approximately once a month, which is in keeping with Thomason's positions as a loan originator and as the president of Territory S&L. The record does not disclose any unusual or lavish expenditures that would alert petitioner to unreported income. Petitioner had no cause to question expenditures made, because she understood that loan proceeds were used to make the major purchases. We do not consider the two fur coats and a diamond necklace to be lavish in view of the amounts of gross income reported on the returns for the years at issue. The reported income for the years in issue was sufficient to sustain the manner in which the family was living in rural Oklahoma. Terzian v. Commissioner, 72 T.C. 1164, 1171 (1979). We also have considered whether Thomason refused *447 to be forthright about the couple's income. Thomason did not discuss business and financial matters with petitioner, but in turn, petitioner did not question her husband about finances. She trusted her husband to take care of financial matters while she took care of five small children. The reason to know standard imposes a "duty of inquiry" on the spouse claiming relief. Stevens v. Commissioner, 872 F.2d at 1505. One cannot turn a blind eye to facts that might give reason to know of unreported income or improper deductions. Terzian v. Commissioner, 72 T.C. at 1170. For the 1983 and 1984 taxable years, petitioner had little reason to inquire because the money she spent was relatively stable and not excessive and the family's lifestyle did not perceptibly change during the years at issue. Petitioner did not have access to bank statements or other financial records or have reason to seek them at that time. Although we can fault petitioner for not reading various financial documents and her tax returns before signing, this fact does not lead us to the conclusion that she had reason to know of the omitted income or *448 improper deductions in 1983 or 1984. Terzian v. Commissioner, 72 T.C. at 1171. Therefore, we hold that petitioner did not know, or have reason to know, of Thomason's grossly erroneous items for taxable years 1983 and 1984. Respondent asserts, however, that, for 1985, petitioner should be reasonably charged with knowledge of the understatements and improper deductions because she remained intentionally ignorant of her husband's activities and the documents that he instructed her to sign. We agree. By October of 1986, when petitioner signed the 1985 tax return, petitioner did have warning signals and should not have signed the 1985 return without some inquiry or investigation. At that time, petitioner knew her husband was under investigation by Territory S&L, the FBI, and the FSLIC. Although she was a trusting and supportive wife with no financial know-how, petitioner herself admits that she had indications, when the investigations began in late 1985 and early 1986, that her husband was not worthy of her trust. The Court believed her testimony that she and her husband did not discuss financial matters, that they "just didn't talk about stuff like *449 that". However, once warnings were sounded, petitioner should have asked some questions; it was unreasonable for petitioner to continue to remain silent and acquiesce in whatever Thomason did. We cannot say, as the Court of Appeals for the Ninth Circuit said in another case: Nothing extraordinary occurred to warn her that the pattern of her accustomed life style had changed. Nothing occurred that could be expected to make her think that * * * [her spouse] was failing to report his income.
Pietromonaco v. Commissioner, 3 F.3d 1342, 1348 (9th Cir. 1993), revg. T.C. Memo. 1991-361. Here investigations by Territory S&L, the FBI, and the FSLIC occurred. Petitioner nonetheless continued to keep her head in the sand, and closed her eyes to what clearly demanded some inquiry on her part. This ostrich-like behavior continued until well after her husband's death in 1991 and until the notice of deficiency was issued in 1992. In conclusion, petitioner did not participate in her husband's business affairs or have access to financial records so that she would have any reason to know of the omitted income or improper deductions *450 in 1983 or 1984. She did not experience a lavish or unusual lifestyle during the years in question. Thomason was not forthcoming to her about the various business and financial transactions in which he was engaged. However, once the Territory S&L, the FBI, and the FSLIC investigations of Thomason commenced prior to the time petitioner signed the 1985 joint tax return, we are not convinced that she did not have a sufficient reason to inquire when asked to sign that return. She had, or should have had, suspicions concerning Thomason's business activities and whether he was being forthright about the family's finances on the 1985 tax return. Petitioner had a duty to examine the return and make inquiries concerning the reporting of income and deductions thereon. Based upon all of the facts and circumstances discussed above, we conclude that petitioner had reason to know of the grossly erroneous items on the 1985 tax return. Petitioner has not satisfied this prerequisite for innocent spouse protection under section 6013(e) for the 1985 taxable year and, therefore, is not entitled to such relief for that year. However, since we have concluded that petitioner did not know and had *451 no reason to know of the grossly erroneous items in 1983 or 1984, we must now consider whether it would be inequitable to hold petitioner liable for the deficiencies and additions to tax for 1983 and 1984. 2. Inequitable to Hold Petitioner Liable
In assessing the equity in holding a spouse liable, we consider (1) whether the spouse claiming relief significantly benefited from the grossly erroneous items attributable to the culpable spouse ( Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989)); (2) whether the spouse claiming relief has been deserted by, or divorced or separated from, the culpable spouse ( sec. 1.6013-5(b), Income Tax Regs.); and (3) probable future hardships that would be visited upon the innocent spouse if she is not relieved from liability ( Sanders v. United States, 509 F.2d at 171 n.16; Dakil v. United States, 496 F.2d 431 (10th Cir. 1974)). In determining whether or not it is inequitable to hold petitioner liable for the understatements of income or additions to tax, a factor to be considered is whether the person seeking relief significantly benefited, directly *452 or indirectly, from the substantial understatements of income. However, normal support is not considered a "significant benefit". Terzian v. Commissioner, 72 T.C. at 1172; sec. 1.6013-5(b), Income Tax Regs.[7] Normal support is determined by the circumstances of the parties. Sanders v. United States, 509 F.2d at 168; Flynn v. Commissioner, 93 T.C. at 367. Respondent contends that it would not be inequitable to hold petitioner liable for the deficiencies and additions attributable to Thomason's business activities because petitioner benefited from the understatements of income. We disagree. The record as a whole shows no significant benefit to petitioner, directly or indirectly, from her husband's financial misdealings. Certainly, the benefits she may have received from trips on the airplane or through writing checks for necessities *453 were not substantial compared with the amounts of income reported. Furthermore, the record shows that many of the purchases to which respondent refers as benefits were acquired through borrowed funds. In addition, the Okmulgee house was acquired as a result of Thomason's divorce from his previous wife, and the houses in Yukon, Oklahoma City, and Seminole were either leased or purchased in succession through mortgages. The cabin on Lake Tenkiller was foreclosed on, along with most of the spouses' properties, including petitioner's two fur coats and diamond necklace. Petitioner and Thomason were never divorced, but petitioner had no reason to question her husband when signing the 1983 and 1984 tax returns. It was not until late 1985 or early 1986, when the investigations of her husband's business activities commenced, that petitioner began to discover that her husband was not deserving of the trust that she had bestowed upon him. We have little doubt that petitioner would suffer grave hardship if forced to pay for Thomason's business misdealings. Since petitioner did not receive any substantial benefit from these activities, we conclude that it would be inequitable to hold her *454 liable for the deficiencies and additions to tax for 1983 and 1984. Petitioner borrowed the money to begin her hair salon business in 1987. Since Thomason's death in 1991, petitioner and the five children have lived on her meager income from that business and Social Security payments as Thomason's surviving widow and children. In conclusion, we hold that petitioner meets all of the requirements of section 6013(e)(1) as an innocent spouse for the taxable years 1983 and 1984 but not for 1985. To reflect the above holding, Decision will be entered for petitioner for 1983 and 1984 and for respondent for 1985. Footnotes
1. During the years at issue, petitioner was married to Robert L. Thomason, Jr. He was killed in an airplane crash on January 5, 1991, over a year before the statutory notice of deficiency was issued.↩
2. The State program under which this loan was obtained involved low-interest loans to single individuals of limited income for the purchase of a principal residence. This transaction straddles the date of petitioner's marriage to Thomason on August 1, 1980. In fact, some of the documents were purportedly signed by petitioner on her wedding day, although petitioner does not recall doing so. Petitioner testified that Thomason wanted to build a cabin on the lake and that this documentation represents the way he did business. Petitioner further testified that she did not recognize the signature on the affidavit of eligibility as hers and that she did not attend the closing on this property. While this Lake Tenkiller cabin transaction has more than a faint whiff of impropriety, this occurred well before the years before the Court and is unrelated to the substantial understatements of income relevant to this case. Also this cabin property was later foreclosed on by the bank, and petitioner no longer enjoys any benefits from this cabin.↩
3. Thomason, unbeknownst to petitioner, continued to use her business bank account and checks for his separate business named Shear Designs. The record does not disclose the nature of that separate business.↩
4. Petitioner did not have a key to Thomason's office. Although respondent pointed out that petitioner had a key to Thomason's post office box, the record indicates that petitioner did not know where financial records were kept and did not have access to them. Bank statements were not normally mailed to the post office box because Thomason normally picked up the statements at the bank. Although petitioner wrote checks on the accounts, she had never seen bank statements prior to just shortly before the trial, when she found some of them stored in the barn behind the Okmulgee house.↩
5. See Schneider v. Commissioner, T.C. Memo. 1992-96↩.
6. Moreover, a substantial improvement in a couple's general standard of living may also put a spouse on notice of unreported income. Flynn v. Commissioner, 93 T.C. 355, 366 (1989); Mysse v. Commissioner, 57 T.C. 680, 698-699↩ (1972).
7. See also Hayes v. Commissioner, T.C. Memo. 1989-327↩.