T.C. Memo. 1996-9


UNITED STATES TAX COURT


PATRICIA S. MAKALINTAL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4980-93, 12793-93.     Filed January 18, 1996.


<u>Richard J. Sideman</u> and <u>Wendy Abkin</u>, for petitioner.

<u>Debra K. Moe</u> and <u>Lloyd T. Silberzweig</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  In these consolidated cases, respondent determined deficiencies in and additions to petitioner's 1986, 1987, and 1988 Federal income taxes as follows:

|  |  | Additions to Tax | | |
|  |  | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1)(A) | 6653(a)(1)(B) | 6661 |
| 1986 | $590,852 | $29,543 | * | $147,713 |
| 1987 | 254,088 | 12,704 | * | 63,522 |
| 1988 | 280,624 | 14,031** | -- | 70,156 |

\* 50 percent of interest due on portion of underpayment attributable to negligence.

\*\* For 1988, the applicable addition to tax was determined under sec. 6653(a)(1).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are whether Ambrosio G. Makalintal, petitioner's former husband, and petitioner underreported their income, and, if so, whether petitioner qualifies as an innocent spouse under section 6013(e).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

In 1967, Mr. Makalintal and petitioner were married in the Philippines, and until 1985 (when they moved to the United States), Mr. Makalintal and petitioner were residents and citizens of the Philippines. Prior to their divorce in 1990, Mr. Makalintal and petitioner had three children.

In the Philippines, Mr. Makalintal was a wealthy businessman, and he engaged in numerous business ventures. Sometime in the late 1970's or early 1980's, Mr. Makalintal organized Integrated Circuits Philippines, Inc. (ICPI), to manufacture semiconductors in the Philippines. Petitioner did not work for or hold any position with ICPI.

In 1970, petitioner graduated from the University of the Philippines with a degree in statistics. In college, petitioner took courses in math, science, literature, and history. Petitioner did not take any accounting or business-related courses.

From 1970 through 1977, petitioner worked for her father-in-law, a judge in the Philippines, and she worked in a small print shop owned by Mr. Makalintal. For her father-in-law, petitioner generally answered the telephone and typed letters. At the print shop, petitioner handled typesetting, mailed bills, deposited payments, and paid two employees of the print shop in amounts determined by Mr. Makalintal. An accountant maintained the books and records for the print shop.

From 1978 until 1985, when Mr. Makalintal and petitioner moved to the United States, petitioner did not work outside the home.

In the Philippines, Mr. Makalintal and petitioner enjoyed a high standard of living. They owned a large home. They employed three housemaids, a chauffeur, and two houseboys. Mr. Makalintal

and petitioner's three children attended private schools. Mr. Makalintal and petitioner would occasionally take vacations to a mountain resort in the Philippines.

While living in the Philippines, petitioner knew the amount of Mr. Makalintal's salary from ICPI, but petitioner did not know how much income Mr. Makalintal was earning from his other businesses and investments. Mr. Makalintal did not discuss any significant aspects of his businesses and investments with petitioner.

In December of 1984, Mr. Makalintal purchased for $600,000 investment real property in Tiburon, California (Tiburon Property). Mr. Makalintal made a cash downpayment of approximately $300,000 and financed the balance of the purchase price for the Tiburon Property.

As indicated, in 1985, Mr. Makalintal, petitioner, and their three children moved to the United States. Mr. Makalintal was issued by the United States a non-immigrant visa that was valid through February of 1989. Apparently, Mr. Makalintal now lives in the Philippines. The record does not indicate whether Mr. Makalintal ever became a U.S. citizen.

Petitioner is now a citizen of the United States and a resident of Sunnyvale, California.

In August of 1985, after Mr. Makalintal, petitioner, and their three children moved to the United States, Mr. Makalintal purchased for $466,438 a home in Greenbrae, California (the

Greenbrae home). Mr. Makalintal made a cash downpayment of $200,000 and financed the balance of the purchase price for the Greenbrae home. The Greenbrae home had 6 bedrooms and 3-½ baths.

In 1985, Mr. Makalintal organized the following three California corporations: Integrated Systems and Support (ISS), Magnacad International (Magnacad), and Magna Financial and Management Corp. (MFMC) (hereinafter sometimes referred to as the California corporations).

ISS was organized to market and sell in the United States semiconductors manufactured in the Philippines by ICPI. Magnacad was organized to purchase in the United States raw materials needed by ICPI for the manufacture of semiconductors. The purpose for MFMC is not made clear in the record.

Mr. Makalintal owned 100 percent of the stock in ISS and MFMC. Mr. Makalintal owned 30 percent, and Jose Santos, petitioner's brother, owned 70 percent of the stock in Magnacad. Petitioner did not own stock in any of the California corporations.

Mr. Makalintal was president, and petitioner nominally was secretary of each of the above California corporations. Petitioner, at the direction of Mr. Makalintal, signed the articles of incorporation of each of the California corporations.

During the years in issue, Mr. Makalintal managed and operated each of the California corporations out of the Greenbrae home.

From 1985 through 1987, the only compensated employees of ISS, Magnacad, and MFMC were Mr. Makalintal and Mr. Santos. Petitioner was not, at any time, an employee of, nor was she paid any compensation by, any of the above California corporations.

From 1985 through 1988, however, petitioner performed in the Greenbrae home a limited amount of clerical work for ISS, Magnacad, and MFMC. At Mr. Makalintal's direction and under his supervision, petitioner, at the Greenbrae home, would occasionally enter data with respect to the California corporations into a computer program that generated profit and loss statements. Petitioner did not have any training or experience with accounting, and petitioner did not understand much of the data entered into the computer. Petitioner made no analysis, and petitioner did not attempt to make an analysis, of the profit and loss statements relating to the California corporations.

Petitioner did not know whether the data Mr. Makalintal gave her to enter into the computer was accurate and complete. Mr. Makalintal did not discuss with petitioner any significant aspects of the California corporations, and he did not permit others to talk to petitioner about the California corporations or businesses.

In March of 1986, Mr. Makalintal entered into a written agreement to sell his 2 million shares of stock in ICPI to Alfredo de Los Angeles for $3 million. No downpayment was due,

and Mr. de Los Angeles agreed to pay Mr. Makalintal quarterly installments of $150,000 in cash, with the first installment due in October of 1987, until the $3 million purchase price for the 2 million shares of stock was fully paid.

The agreement for the sale of ICPI stock to Mr. de Los Angeles was negotiated and entered into by Mr. Makalintal and Mr. de Los Angeles in the Philippines. Mr. Makalintal did not discuss this sales agreement with petitioner. Petitioner did not participate in the negotiations, and petitioner was not aware of the terms of the sale.

In December of 1987, Mr. Makalintal hired Lorna Ombawa as an assistant to work for his California corporations, and in October of 1988, Mr. Makalintal hired Grace Cruz to be his assistant. After being hired, Ms. Ombawa, instead of petitioner, entered data into the computer for purposes of maintaining profit and loss statements relating to the California corporations.

Ms. Cruz supervised Ms. Ombawa, made purchases for ISS, and paid bills for each of the California corporations.

At Mr. Makalintal's insistence, Ms. Cruz and Ms. Ombawa also lived in the Greenbrae home with Mr. Makalintal and petitioner.

During the years in issue, Mr. Makalintal maintained numerous bank accounts for his personal use and for use of each of the California corporations.

In 1986, 1987, and 1988, large transfers of funds occurred from the various bank accounts maintained by Mr. Makalintal and

from other sources into account 01150, a personal bank account maintained by Mr. Makalintal in his and petitioner's names. Generally, the funds transferred into account 01150 were then withdrawn and transferred into account 01206, another personal account maintained by Mr. Makalintal in his and petitioner's names or into various bank accounts of the California corporations owned and operated by Mr. Makalintal.

In 1986, 1987, and 1988, petitioner made occasional withdrawals from account 01206 but only at the specific direction of Mr. Makalintal. Petitioner also wrote checks on account 01206 but only to payees and in amounts that were approved by Mr. Makalintal. In 1987, on account 01206, petitioner wrote 314 checks totaling $146,282, and in 1988, petitioner wrote 665 checks totaling $367,323.

At the specific direction of Mr. Makalintal, petitioner occasionally transferred funds among the various personal bank accounts that Mr. Makalintal maintained and the separate bank accounts of the various California corporations. Mr. Makalintal did not disclose to petitioner the source of the funds that she was directed to deposit into the various bank accounts nor the reason for the withdrawals and deposits that she was directed to make among the various accounts.

Other than data entry, the transfer of funds among the bank accounts, and the writing of checks, as described above, all done at the specific direction of Mr. Makalintal, petitioner was not

involved in the decisions and day-to-day operations relating to the California corporations.

In California, during 1986, 1987, and 1988, Mr. Makalintal and petitioner employed a cook and a chauffeur, and two of their children attended private schools. During 1986, Mr. Makalintal purchased a Ferrari and three Mercedes Benz automobiles. Mr. Makalintal did not allow petitioner to drive any of the automobiles.

In November of 1986, Mr. Makalintal apparently sold or deeded the Greenbrae home to Mr. Santos. Mr. Makalintal and petitioner, however, continued to live in the Greenbrae home. Although the record is not clear, it appears that sometime before 1990, the Greenbrae home was deeded back to Mr. Makalintal and petitioner.

During 1986, 1987, and 1988, Mr. Makalintal and petitioner's standard of living remained at a level similar to that which they had enjoyed in the Philippines.

Throughout their marriage, petitioner lived in fear of Mr. Makalintal. He repeatedly physically abused petitioner. On numerous occasions, Mr. Makalintal threatened to kill petitioner with a gun or a knife. During 1986, 1987, and 1988, Mr. Makalintal did not allow petitioner to leave the Greenbrae home without his permission, and from late 1987 through early 1990, after Ms. Cruz and Ms. Ombawa began working for the California corporations, Mr. Makalintal required petitioner to

spend most of each day in the master bedroom of the Greenbrae home. Mr. Makalintal also physically abused his children.

In the fall of 1989, Mr. Makalintal informed petitioner that he planned to divorce her. In March of 1990, Mr. Makalintal forced petitioner to travel with him to New York City to petition a New York State court for a divorce.

In April of 1990, petitioner discovered Mr. Makalintal and Ms. Ombawa were having an affair in the Greenbrae home. The next day, petitioner moved out of the Greenbrae home, taking with her only some of her personal belongings and a minimal amount of cash.

During the summer of 1990, petitioner began taking business-related courses at a community college in San Mateo, California. In the summer of 1990, petitioner received from Mr. Makalintal $135,000 for support of herself and their three children.

On August 3, 1990, Mr. Makalintal and petitioner's divorce was finalized, and a property settlement agreement was approved by the New York State court under which petitioner was to receive sole custody of their three children, ownership of the Greenbrae home, $2,000 per month from Mr. Makalintal for child support and alimony, and several of Mr. Makalintal's automobiles.

Except, however, for the above-referenced $135,000 and $10,553 that petitioner received on the sale of the Greenbrae home, petitioner has not received any of the above support, alimony, or property from Mr. Makalintal. Petitioner now

supports herself and the three children with full-time employment and has a modest standard of living.

In June of 1991, petitioner graduated from the College of San Mateo with a degree in business.

For 1986, 1987, and 1988, petitioner and Mr. Makalintal filed joint Federal income tax returns.  These returns were prepared by Katie Yue, an independent certified public accountant.  The table below summarizes for 1986, 1987, and 1988, the gross income, itemized deductions, and taxable income that were reported on these joint Federal income tax returns.

| Year | Gross Income | Itemized Deductions | Taxable Income |
|------|--------------|---------------------|----------------|
| 1986 | $34,006 | $89,352 | $-0- |
| 1987 | 33,945 | 29,268 | -0- |
| 1988 | 73,544 | 72,236 | -0- |

On the tax return for 1986, no income was reported with respect to Mr. Makalintal's sale in the Philippines of his stock in ICPI for $3 million.

When Ms. Yue prepared Mr. Makalintal and petitioner's 1986 joint Federal income tax return, Ms. Yue expressed concern to her supervisor at the accounting firm that income reported on the return was not sufficient to support Mr. Makalintal and petitioner's lifestyle.  Ms. Yue's supervisor then questioned Mr. Makalintal specifically with respect to the income reported, and Mr. Makalintal explained that additional nontaxable financial

resources were available to him from his business interests in the Philippines. Ms. Yue and her supervisor accepted Mr. Makalintal's explanation and finalized the return for Mr. Makalintal's and petitioner's signatures.

When Mr. Makalintal gave petitioner the 1986 joint income tax return for her signature, petitioner reviewed the return, and petitioner also specifically asked Mr. Makalintal how Mr. Makalintal and she were able to afford such a high standard of living in light of the income reported on the return. Mr. Makalintal informed petitioner that he had access to funds in the Philippines that had been earned in years prior to 1986 and that were not reportable as income for 1986.

Because, among other reasons, Mr. Makalintal frequently represented that his business interests in the Philippines were successful and because Mr. Makalintal used an accounting firm to prepare the income tax return, petitioner accepted Mr. Makalintal's explanation of the income reported on the 1986 return, and petitioner signed the return.

In connection with her review and signing of the 1987 and 1988 joint Federal income tax returns, petitioner again asked Mr. Makalintal about the income reported thereon in light of the money they were spending. Mr. Makalintal again reassured petitioner that he had available nontaxable financial resources from the Philippines.

For 1986, 1987, and 1988, Ms. Yue also prepared the Federal corporate income tax returns of the California corporations.

During respondent's audit for 1986, 1987, and 1988, and during the litigation of these cases, petitioner has been unable to obtain from Mr. Makalintal, who apparently has moved back to the Philippines, information and records pertaining to the bank accounts that Mr. Makalintal controlled and the purported sale of Mr. Makalintal's 2 million shares of stock in ICPI.  Based largely on petitioner's inability to provide adequate information, respondent determined that Mr. Makalintal should be treated as having received in 1986 the entire $3 million stated sales price for the ICPI stock and as having no tax basis in the stock.  Thus, respondent treated the entire $3 million stated sales price as additional net long-term capital gain for 1986.

For 1987 and 1988, apparently based just on bank deposits analyses of the two bank accounts numbered 01150 and 01206 (limited information with respect to which petitioner was able to provide to respondent), respondent determined that Mr. Makalintal and petitioner realized unreported additional income of $690,922 and $969,584, respectively.

Also for 1988, respondent determined that $31,335 was improperly claimed as a home mortgage interest expense deduction

on Mr. Makalintal and petitioner's 1988 joint Federal income tax return.[1]

Based on the trial evidence, respondent has adjusted downward the unreported income that she now claims, under her bank deposits analyses, should be charged to Mr. Makalintal and petitioner for 1987 and 1988 from $690,922 and $969,584, respectively, to $501,134 and $332,601, respectively.

For 1986, 1987, and 1988, respondent also determined against Mr. Makalintal and petitioner additions to tax for negligence under section 6653(a) and for substantial understatements under section 6661.

As indicated, Mr. Makalintal apparently now resides in the Philippines, is divorced from petitioner, and apparently is ignoring his obligations to petitioner and his children under the divorce decree and property settlement agreement and his obligations to respondent under the notices of deficiency mailed to him for the years in dispute.

OPINION

1986 Income from Sale of ICPI Stock and
Respondent's Bank Deposit Analyses

Section 453 provides generally that income from an installment sale shall be taken into account under the

---

[1] The parties have stipulated that the $31,335 home mortgage interest expense deduction claimed on Mr. Makalintal and petitioner's 1988 joint Federal income tax return was improper.

installment method.  Sec. 453(a).  An installment sale constitutes a sale under which at least one payment is to be received after the close of the year in which the sale occurs. Sec. 453(b)(1).  For the years before us, the installment method of reporting income relating to an installment sale generally applies, unless the taxpayer elects otherwise.  Sec. 453(d)(1).

Petitioner acknowledges that evidence regarding the sale of Mr. Makalintal's 2 million shares of ICPI stock is incomplete but she argues, among other things, that no evidence indicates that Mr. Makalintal's purported sale of his ICPI stock for $3 million was actually consummated or that Mr. Makalintal actually received any portion of the $3 million stated sales price.  Further, petitioner argues that under the written installment sales agreement between Mr. Makalintal and Mr. de Los Angeles, any income to be charged to Mr. Makalintal with regard to the purported sale of the ICPI stock should qualify for installment-sale treatment under section 453 and that (because none of the sales proceeds was scheduled to be received in 1986) none of the income relating to the sale should be taxable in 1986. Petitioner also disputes respondent's bank deposits analyses for 1987 and 1988.

As explained, respondent takes the position that because of the inadequacy of the evidence relating to the sale, Mr. Makalintal's sale of ICPI stock for a stated $3 million should be treated as fully taxable to Mr. Makalintal in 1986.

Further, in her post-trial brief and without amending her answer, respondent raises, in the alternative, a new issue that if the $3 million stated sales price for the sale of the ICPI stock is not taxable as long-term capital gain in 1986, then the scheduled installment payments to be received by Mr. Makalintal in 1987 and 1988 (namely, $150,000 in 1987 and $600,000 in 1988[2]) should be charged to Mr. Makalintal for each of those years, in addition to the additional adjusted income already charged to Mr. Makalintal and petitioner under respondent's bank deposits analyses for those years.

In response to respondent's new alternative issue, petitioner argues that respondent has not timely and properly raised an issue herein as to the recognition, for 1987 and 1988, of any income received by Mr. Makalintal on the installment sale of his ICPI stock. Further, petitioner argues that any income that arguably might have been received by Mr. Makalintal in 1987 and 1988 from the installment sale should be treated as already charged to Mr. Makalintal and to petitioner as part of respondent's bank deposits analyses for those years.

On the limited record before us on this issue and in the absence of any contrary evidence, we conclude that Mr. Makalintal's sale of ICPI stock to Mr. de Los Angeles was

---

[2]  According to the sales agreement, in 1987 one quarterly installment payment of $150,000 was to be received, and in 1988 four quarterly installment payments of $150,000 each were to be received for a total of $600,000.

consummated consistently with the terms of the written sales agreement.  Respondent's bank deposits analyses for 1987 and 1988 indicate large unexplained deposits that may well represent proceeds received in those years as payments on the sale of Mr. Makalintal's ICPI stock.

We also conclude that Mr. Makalintal's sale of ICPI stock qualifies as an installment sale under section 453 and that under that method, because no sales proceeds were scheduled to be received by Mr. Makalintal in 1986, no income relating to the installment sale is properly includable in Mr. Makalintal and petitioner's joint income for 1986.

Further, with regard to 1987 and 1988 and to respondent's new alternative issue, respondent has not amended her answer or otherwise properly and timely raised an issue herein as to the taxability in 1987 and 1988 of the scheduled installment payments to be received by Mr. Makalintal in those years.  See Rules 40 and 41; Church of Scientology v. Commissioner, 83 T.C. 381, 524 (1984), affd. 823 F.2d 1310 (9th Cir. 1987); Professional Serv. Corp. v. Commissioner, 79 T.C. 888, 924 (1982).  We shall not consider this issue.

With respect to the additional income respondent has charged to Mr. Makalintal and petitioner for 1987 and 1988 using the bank deposits analyses (namely, $501,134 for 1987 and $332,601 for 1988), petitioner bears the burden of proving that the deposits

are attributable to a nontaxable source.  Calhoun v. United States, 591 F.2d 1243, 1245 (9th Cir. 1978).

Petitioner argues generally that the various deposits that respondent has treated as unexplained for 1987 and 1988 represent transfers among the various bank accounts and are not properly treated as income.

With limited records available, petitioner established at trial that several of the deposits into accounts 01150 and 01206 represented transfers among those two accounts, and respondent has adjusted the unreported income determined from her bank deposits analyses to reflect that evidence.  Petitioner has not established that the remaining deposits reflected in respondent's bank deposits analyses are attributable to nontaxable sources, and petitioner has not satisfied her burden of proving that the remainder of the unexplained deposits should not be treated as includable in Mr. Makalintal's and her joint income for 1987 and 1988.

For 1987 and 1988, the unexplained deposits of $501,134 and $332,601, as determined and adjusted by respondent, are to be treated as additional income and are to be charged to Mr. Makalintal and to petitioner.

Innocent Spouse Issue

In light of our findings and conclusion in favor of petitioner with regard to 1986 on the substantive tax adjustment,

petitioner's claim of innocent spouse status for 1986 is arguably moot. We address this innocent spouse issue for 1986, however, as an alternative issue on which petitioner is relying. Petitioner also argues that she qualifies as an innocent spouse for 1987 and 1988 with regard to any understatements in tax relating to Mr. Makalintal's sale of his ICPI stock and to the deposits into Mr. Makalintal and petitioner's bank accounts.

Generally, where a husband and wife file a joint Federal income tax return, they are jointly and severally liable for any tax due. Sec. 6013(d)(3); Ness v. Commissioner, 954 F.2d 1495, 1497 (9th Cir. 1992), revg. 94 T.C. 784 (1990); Guth v. Commissioner, 897 F.2d 441 (9th Cir. 1990), affg. T.C. Memo. 1987-522; Price v. Commissioner, 887 F.2d 959 n.3 (9th Cir. 1989), revg. an Oral Opinion of this Court. An exception to this general provision is found in section 6013(e), the so-called innocent spouse provision. A spouse qualifies as an innocent spouse if the spouse establishes: (1) A joint return was filed; (2) the return contained a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the spouse seeking relief did not know and had no reason to know of the substantial understatement; and (4) it would be inequitable to hold the spouse seeking relief liable for the understatement in question. Sec. 6013(e)(1); Pietromonaco v. Commissioner, 3 F.3d 1342, 1345 (9th Cir. 1993),

revg. T.C. Memo. 1991-361; Guth v. Commissioner, supra at 443; Price v. Commissioner, supra at 961-962.

Respondent concedes herein that Mr. Makalintal and petitioner filed joint Federal income tax returns for 1986, 1987, and 1988 and that any substantial understatements of tax reflected thereon (relating to Mr. Makalintal's sale of his ICPI stock and to the deposits into Mr. Makalintal and petitioner's bank accounts) are attributable to grossly erroneous items of Mr. Makalintal. Respondent, however, argues that petitioner knew or had reason to know of substantial understatements of tax relating to the above items and that it would not be inequitable to hold petitioner liable therefor.

Generally, the question of whether a spouse knew or had reason to know of a substantial understatement is governed by whether "a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted." Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; see Griner v. Commissioner, 951 F.2d 360 (9th Cir. 1991), affg. without published opinion T.C. Memo. 1990-301; Bokum v. Commissioner, 94 T.C. 126, 148 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). The standard is based on a reasonably prudent taxpayer in the particular circumstances of the taxpayer involved in the case. Pietromonaco v. Commissioner, supra at 1345.

Factors relevant to the consideration of whether a spouse had reason to know of a substantial understatement include: (1) The spouse's level of education; (2) the spouse's involvement in the business and financial affairs of the marriage and of the transactions that give rise to the understatement; (3) the presence of expenditures that appear lavish or unusual when compared to the taxpayers' accustomed standard of living and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning family finances. Pietromonaco v. Commissioner, supra at 1345; Price v. Commissioner, supra at 965; Stevens v. Commissioner, supra at 1505.

A spouse's specific and detailed knowledge of the underlying transaction or business giving rise to the income omitted from the return may, in certain circumstances, be treated as putting the spouse on notice of the understatement. McCoy v. Commissioner, 57 T.C. 732 (1972); Mayworm v. Commissioner, T.C. Memo. 1987-536. Also relevant is the extent to which family expenses, about which the spouse had knowledge or awareness, exceeded reported income. Pietromonaco v. Commissioner, supra at 1345; Hammond v. Commissioner, 938 F.2d 185 (8th Cir. 1991), affg. without published opinion T.C. Memo. 1990-22. Involvement by a spouse in a family's financial affairs may give rise to a reason to know of an understatement. Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part, revg. in part, and remanding in part T.C. Memo. 1984-310; Sanders v. United States,

509 F.2d 162, 168 (5th Cir. 1975); Alberts v. Commissioner, T.C. Memo. 1986-483.

Physical or mental abuse may also be a factor in considering a claim for innocent spouse relief. Kistner v. Commissioner, 18 F.3d 1521, 1526 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463.

With regard to whether petitioner had reason to know of any understatements of tax for 1986, 1987, and 1988, relating to Mr. Makalintal's sale of his ICPI stock and to the deposits into Mr. Makalintal and petitioner's bank accounts, petitioner argues that she was not significantly involved in the affairs and day-to-day operations of Mr. Makalintal's businesses and corporations, that she wrote checks only on one account and only at Mr. Makalintal's specific direction and approval, that she was repeatedly physically abused by Mr. Makalintal, and that she did not know or have reason to know of the substantial understatements of tax.

Respondent argues that because petitioner had a college degree, was somewhat involved in Mr. Makalintal's corporations, wrote many checks on at least one of the personal bank accounts, and enjoyed a high standard of living, petitioner should be treated as having known or as having reason to know of the substantial understatements.

We agree with petitioner. During 1986, 1987, and 1988, petitioner did not have any significant experience in accounting

or business.  Petitioner did not assist Mr. Makalintal in any meaningful way in any of the income-producing activities of his businesses or corporations.

Petitioner was not aware of Mr. Makalintal's sale of his ICPI stock.  Mr. Makalintal did not disclose to petitioner the source of the funds that were deposited into their bank accounts.

Petitioner reviewed the 1986, 1987, and 1988 Federal income tax returns, and she specifically inquired of Mr. Makalintal how the income reported thereon could support their lifestyle.  Based on her discussions with Mr. Makalintal about the 1986, 1987, and 1988 joint Federal income tax returns, petitioner reasonably believed that funds that Mr. Makalintal had earned in prior years from his businesses and investments in the Philippines constituted the funds that were being used to support the family's lifestyle.  Petitioner credibly testified in this regard.

Petitioner's acceptance of Mr. Makalintal's explanation was reasonable in light of the high standard of living they had experienced in the Philippines and the apparent success of Mr. Makalintal's businesses and investments in the Philippines. Ms. Yue and Ms. Yue's supervisor accepted the same explanation from Mr. Makalintal.

During 1986, 1987, and 1988, Mr. Makalintal and petitioner's standard of living remained consistent with prior years.

Further, in light of the frequent physical abuse by Mr. Makalintal and Mr. Makalintal's general refusal to discuss his business and financial affairs with petitioner, we believe that petitioner's inquiry was reasonable and sufficient to satisfy her duty of inquiry with regard to the taxable income reported on Mr. Makalintal's and her 1986, 1987, and 1988 joint Federal income tax returns. See Price v. Commissioner, supra at 966.

The final element in considering whether petitioner qualifies for innocent spouse relief is whether, in light of all of the facts and circumstances, it would be inequitable to hold petitioner liable for the alleged understatement for 1986 relating to the sale of the ICPI stock and for the substantial understatements for 1987 and 1988 that we have sustained relating to the deposits into Mr. Makalintal and petitioner's bank accounts. Sec. 6013(e)(1)(D); Flynn v. Commissioner, 93 T.C. 355, 367 (1989); sec. 1.6013-5(b), Income Tax Regs. This issue turns largely on the question of whether petitioner benefited directly or indirectly from the understatements of tax. Flynn v. Commissioner, supra at 367; Bell v. Commissioner, T.C. Memo. 1989-107; sec. 1.6013-5(b), Income Tax Regs. Normal support of a spouse and children is not regarded as a significant benefit and is to be considered in light of the circumstances of the parties. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Flynn v. Commissioner, supra at 367; Bell v. Commissioner, supra.

Also to be considered is whether the spouse claiming relief has been deserted, divorced, or separated. Kistner v. Commissioner, T.C. Memo. 1995-66; sec. 1.6013-5(b), Income Tax Regs.

Further, in deciding whether it would be inequitable to hold a spouse liable for understatements of tax, it is relevant to consider the probable future hardships that would be imposed on the spouse seeking relief, if such relief was denied. Sanders v. United States, supra at 171 n.16; Dakil v. United States, 496 F.2d 431, 433 (10th Cir. 1974).

Petitioner argues that it would be inequitable for her to be held liable for any understatements of tax relating to Mr. Makalintal's sale of ICPI stock and to the deposits into Mr. Makalintal and petitioner's bank accounts because she did not significantly benefit from any understatements of income and because she and the children received the same level of financial support from Mr. Makalintal during 1986, 1987, and 1988 that she and the children had received in prior years and because she received little from him in later years.

Respondent argues that it would not be inequitable to hold petitioner liable for any understatements in tax relating to the above issues because Mr. Makalintal and petitioner lived a lavish lifestyle in comparison to the income reported on the returns and because petitioner was to receive substantial funds and property from Mr. Makalintal under the property settlement agreement.

During 1986, 1987, and 1988, petitioner's standard of living and level of support from Mr. Makalintal did not significantly increase in comparison to the standard of living and the level of support in prior years.

In 1990, after Mr. Makalintal and petitioner divorced, petitioner received from Mr. Makalintal approximately $135,000 for living expenses and for support of the children. Petitioner was accustomed to a high standard of living, and the $135,000 was at least consistent with her standard of living and did not provide petitioner a significant benefit beyond her normal support. Aside from the $10,553 that petitioner received from sale of the Greenbrae home, petitioner did not receive any of the additional property, alimony, or child support to which she was entitled under the property settlement agreement.

Throughout their marriage and during 1986, 1987, and 1988, Mr. Makalintal physically abused petitioner, and petitioner lived in constant fear of him. Mr. Makalintal and petitioner are now divorced. Mr. Makalintal apparently is now living in the Philippines and refused to provide petitioner with certain records relevant to the issues in these cases.

Denying petitioner innocent spouse relief in these cases would likely cause very substantial hardship to petitioner. Mr. Makalintal has abandoned petitioner and left her to deal with substantial income tax understatements that are attributable to him. Petitioner has had to pursue further education to support

herself and her children, living well below her former standard of living, while receiving virtually no support from Mr. Makalintal.

We conclude that it would be inequitable to hold petitioner liable for any income tax understatements sustained herein with respect either to Mr. Makalintal's sale of his ICPI stock or to the deposits into Mr. Makalintal and petitioner's bank accounts and that petitioner qualifies for innocent spouse relief under section 6013(e)(1) with respect thereto.

## Mortgage Interest Expense Deduction

Petitioner has not specifically argued that she qualifies for innocent spouse relief with respect to that portion of the income tax understatement for 1988 relating to the erroneous $31,335 home mortgage interest expense deduction. We conclude that for 1988 petitioner is liable for the portion of the 1988 income tax understatement relating thereto.

## Additions to Tax

Our conclusion herein that petitioner qualifies for innocent spouse relief as to the portion of any understatements in tax for 1986, 1987, and 1988 (that are attributable to the sale of Mr. Makalintal's ICPI stock and to respondent's bank deposits analyses) also relieves petitioner from any liability for the additions to tax relating thereto. See flush language of section 6013(e)(1).

Because, however, the erroneous mortgage interest expense deduction is not attributable to Mr. Makalintal, the innocent spouse provision of section 6013(e)(1) does not immunize petitioner from liability for the additions to tax for 1988 that are attributable to that adjustment.  Petitioner has not provided any evidence as to the basis for this claimed deduction, and petitioner has not provided any substantial authority or reasonable cause for claiming this deduction.

We sustain for 1988 the portion of the negligence addition to tax under section 6653(a)(1)(A) and (B) and the portion of the substantial understatement addition to tax under section 6661(a) that are attributable to the understatement in tax for 1988 that relates to the claimed mortgage interest expense deduction.

Decisions will be entered under Rule 155.